In the Matter of Petition of William BANKS, owner of the Yacht Jesting II, for Limitation and Exoneration.

No. 19690.

United States District Court
E. D. New York.

July 13, 1955.

Haight, Gardner, Poor & Havens, New York City, proctors for the petitioner, by Walter A. Darby, Advocate, New York City, and John J. Mulcahy, Jr., Advocate, Brooklyn, N. Y.

Francis M. Verrilli, New York City, proctor for claimant 2912 Emmons Avenue Corporation, by E. F. Cummerford, Advocate, New York City.

Charles A. Hirsch, Brooklyn, N. Y., proctor for claimant Lloyd Garrison.

Bernhardt M. Meisels, New York City, proctor for claimant Cacace.

Leo Cappelletti, New York City, Proctor for claimant John Falcone.

BYERS, District Judge.

This limitation proceeding was initiated by the filing of a petition on May 31, 1951 by the owner of the yacht Jesting II, and recites that during part of November 1950 (actually it was November 12), the said yacht was moored at the dock of one Garrison on the northerly side of Sheepshead Bay (3000 Emmons Avenue), Brooklyn, pursuant to a contract "for storage of the Jesting II throughout the winter of 1950–1951."

That on November 25, 1950 the yacht was subjected to winds of hurricane force and to the pounding of floating piles, dock structures and floats and other debris, whereby at about 7:30 a. m. on that day she was caused to break away from said mooring and be driven by the force of the winds in a westwardly direction along the shoreline fronting Emmons Avenue.

That the owner's employees at about 7:00 a. m. boarded the vessel and made every effort to attempt to save it but the storm caused her to be driven as stated, causing damage to the yacht and to certain shore structures and vessels, for which the petitioner was not at fault through negligence or otherwise.

That a libel was filed against the yacht by 2912 Emmons Avenue Corporation (for convenience to be called Peters), for damages to its property, and that other actions of a like nature are likely to be brought whereby the petitioner seeks the benefit of limitation of liability according to the applicable statutes; that questions of liability will be contested.

The cause came to trial on May 24, 1955 and the following claimants participated:

The said Emmons Corporation, to be called Peters;

Lloyd Garrison, the proprietor of the establishment at which the yacht was to be stored according to the said contract;

John Falcone, owner of the motorboat Marian F, said to have been damaged at the time or shortly after the Jesting II fetched up at a city bulkhead later to be described;

Thomas Cacace, owner of the motorboat Jolo said to have been struck by the Jesting II as she was drifting to that bulkhead.

All of the damage claimants offered testimony in support of their claims and seek to defeat limitation.

The Jesting had arrived at the Garrison property on November 12, 1950 and at that time she was temporarily moored off or adjacent to the floats which constitute part of the structures on the Garrison property. That mooring was under the direct supervision of the petitioner Banks, and it was understood to be only temporary.

On November 21 the petitioner sent four of his men down to the yacht to make her fast in a snug berth where she was to remain throughout the winter, and the manner in which that was accomplished is shown by petitioner's Exhibit 4, a sketch made by one of the men, which indicates what lines and anchors were put out.

The Jesting II is a yawl rigged yacht 67 feet in length with a beam of 18 feet and depth of 9 feet, 59 tons gross, 44 tons net, and is equipped with an auxiliary diesel engine which operates a screw propeller. The horsepower was not stated and is not important, for reasons which will appear.

The mooring which was accomplished on November 21, left the vessel alongside, bow to the East but breasted off a float. The petitioner's brief summarizes the testimony as to the details of the

mooring, and since Garrison said that petitioner's Exhibit 4 is substantially correct, and there is no evidence to the contrary, the petitioner's statement in his brief on the subject is adopted, as follows:

"The port anchor chain was run out diagonally to a new piling or dolphin designated by Garrison. A 175 pound to 200 pound anchor was placed diagonally off the starboard bow of the Jesting at a distance of about 175 feet (Petitioner's Exhibit 4). This was a Navy type, or Danforth anchor, and a new 4 inch manila line was used. A 175 pound to 200 pound Danforth, or Navy type, anchor was let out diagonally from the starboard quarter. A 175 pound to 200 pound anchor was let out from the port quarter on a diagonal. A 4 inch new manila breast line was doubled up around a piling of the dock. A 4 inch manila stern breast line was around a piling, either at or in the vicinity of the Garrison dock. These lines are shown on petitioner's Exhibit 4 in evidence and are agreed to by all witnesses including Garrison although Garrison stated that, in addition to the lines shown on petitioner's Exhibit 4, there were also spring lines attached to the floats which, in turn, were attached to the dock and other lines were also out to two (mushroom) anchors amidship."

Perhaps it is not without significance that the vessel was berthed for the winter season of 1949, at the same place in the Garrison Yard; no testimony has been offered to the effect that the mooring was rigged in any different way for that winter season.

The storm which broke in the early hours of November 25th was severe to the extent indicated in a special report issued by the Department of Commerce, Weather Bureau entitled "Report on the Storm of November 25, 1950 Prepared under the direction of Ernest J. Christie, Meteorologist in Charge," which is Petitioner's Exhibit 3, part of which follows:

"From early morning to late evening of November 25, 1950, the New York City metropolitan area was battered by a severe storm. Heavy rain fell, and sustained winds of gale force attained peak gust speeds in excess of 90 m. p. h. during the afternoon. While neither rainfall nor wind velocities set new local records, the storm was one of the greatest experienced in the New York area. The storm, moreover, was part of a vast atmospheric disturbance which, from November 24th to November 26th, brought strong winds, rain squalls, and high tides to the North Atlantic coastal region, * * *. Regarded from this larger point of view, the whole storm may be considered the worst ever experienced over the eastern part of the country, though in any given locality it may not have been the worst so far as loss of life, injuries, and property damage are concerned.

"In New York City, the violence of the storm caused it to be compared with the hurricanes of 1938 and 1944. The November 25th storm was *not* a hurricane. * * *.

"Although the 1938 and 1944 hurricanes caused greater wind velocities in New York City and vicinity, the duration of strong winds in the recent storm was longer. * * *."

It is the same storm commented upon by Judge Goddard in his opinion of June 23, 1955 in the case of Petition of Bronx Towing Line, etc., No. A168–357 in the Southern District, wherein he says:

"This litigation arises out of an unusually violent storm on Saturday, November 25, 1950, when the petitioner's stakeboat, with 11 scows moored east of Clason Point, on the East River, dragged her anchor, parted her chain and caused substantial damage to docks, buildings on the shore, boats and other property."

It is of importance to realize that the onset of this storm seems not to have been anticipated according to the forecasts of November 24, which were:

"11 A.M. Forecast for New York City and Vicinity, etc.

"Considerable cloudiness this afternoon high 45–50. Cloudy tonight followed by occasional rain probably changing to snow flurries early Saturday morning with temperatures falling into 20's by daybreak. Considerable cloudiness much colder and windy Saturday with temperatures remaining in the 20's.

"Moderate northeast to easterly winds this afternoon and tonight shifting to moderate to fresh northwesterly by daybreak Saturday. Fresh to strong northwest to northerly winds Saturday."

The 11:00 p. m. forecast contained the following:

"Fresh to strong northeast winds tonight and Saturday gradually backing to north Saturday night and becoming moderate to fresh northwest Sunday."

November 25, 1950 5:30 a. m. forecast:

"Forecast for New York City and Vicinity, etc.

"Southeasterly winds increasing to 40–50 mph with gusts to 60 mph today and becoming westerly late this afternoon or tonight, and diminishing gradually to 20–30 mph by Sunday morning."

The radio broadcast at 7:45 a. m. was substantially like the above.

A 10:00 a. m. special bulletin contains the following:

"An intense low pressure storm attended by gale to near hurricane force winds now located over southern Maryland is expected to pass near metropolitan New York area around 7 P.M. this evening * * *."

The 11:00 a. m. forecast for New York City and Vicinity, etc.:

"Rain with gale winds this afternoon with temperatures in the 50s. * * *."

The foregoing are thought to establish the nature and the severity of the storm, its unheralded appearance, and the absence of timely storm warnings.

The finding is that there were no storm warnings prior to the early morning of November 25.

The Jesting had been moored, as stated, on November 21 in the presence of Garrison who observed all that was done as the work was going forward. At the trial he testified that he did not regard the task to have been satisfactorily accomplished. His criticism as made on direct examination was directed to the weight of the anchors used. That would be more convincing if the anchors had dragged under the storm conditions that developed on the 25th but that has not been shown. It was the parting of her new lines that caused the Jesting to go adrift.

There is a conflict in the testimony between Garrison and Marshall called by the petitioner, as to a conversation related by the former as having taken place on November 21st when the mooring operation had been completed. He said that he told the man in charge very emphatically that the anchors that had been put out were inadequate and that they were not put out right, and "I told him very emphatically to get in touch with Mr. Banks, to have him move the boat."

This is flatly contradicted by Marshall who said that when the job had been finished there was no conversation with Garrison, but the men reported to him that they were finished and were about to leave, and "he O.K.'s everything." There is no evidence of such a protest made to the petitioner or his son, during the ensuing three days.

Something should be said about the men who did the mooring. They were all employees of Banks whose business is that of a ship rigger, and they were of that calling; each had a rating of A.B.,

namely Marshall, Oettchen, and two other riggers. Of the foregoing, Marshall was the foreman rigger and had been in the employ of the petitioner since 1917, and his experience as a seaman was extensive. In other words, the men who handled the job on November 21st were far more experienced in the practical necessities of the situation, than any of the witnesses who criticized either the work that was done or the manner of its performance.

The finding on this subject is that the mooring of the Jesting II on November 21, 1950 was proper and adequate to meet all reasonably expectable conditions of wind and tide in the location in which she was placed.

On November 25 the storm broke with severity at around 4:00 to 4:30 a. m., and the claimant Garrison, having become aware of conditions, caused a telephone message to be sent to the wife of the petitioner; she in turn arranged with some of his employees to go at once to the Jesting, which had been observed to be in difficulties, namely, she was turned almost broadside to the easterly wind and was hampered by one float to which she had been made fast, which had pulled free and was lying alongside the vessel under her stern, and another was lying broadside.

The response to the telephone message was prompt, for at about 7:00 to 7:30 the following riggers, all former seamen, in the employ of the petitioner arrived and sought in every way to release the vessel from her then position. These men were Marshall, Smith, Patnod and Ytroey.

Garrison observed their work as follows:

"They did a very good job, except that they had nothing to work with. There was no anchor on deck, and nothing else outside of lines, and lines at that point would do nobody any good."

At about the time of the arrival of these men, Garrison estimated the wind force to be from 85 to 90 miles an hour.

Under these conditions the Jesting was cut loose by these men so that she no longer exerted a pulling force on any part of the Garrison structure. Garrison described what he saw thus:

"\* \* \* so she turned around a little bit more (westerly), and these men with cold chisels or hatchets or whatever they had in their hands, in an effort to free the boat, chopped everything free except the one float they had on the side. But the other float, \* \* \* stayed right there underneath the pavilion."

On conflicting testimony, if it can be so designated, it is found that the Jesting II had no power in her motor, which had been disconnected, the fuel oil and batteries having been drained when she was brought to the Garrison property for lay-up, on November 12th or on the following day the 13th.

The contrary testimony on the part of certain of the witnesses who testified that they either heard her engine in motion or observed her exhaust is not accepted, because none of them was in a position to make an intelligent observation. The testimony of the highly competent men who were on the vessel leaves no doubt whatever on this subject.

While the yacht was in the position described above, she caused damage to the Garrison property, namely, the Jesting and the floats which have been mentioned kept banging into the pavilion and in and through it; her main boom went through the windows of the pavilion and lifted that building off its foundation. It is by reason of the foregoing damage that Garrison makes his claim.

The Jesting moved westward from the Garrison float encumbered by one or more floats and other floating debris; trailing lines fouled her rudder and propeller, and as she drifted she was not under control, and it is so found.

A few hundred feet west of the Garrison property is that of the claimant called for convenience Peters, where there was a small boatyard, floating

equipment and structures convenient for the use of small boats. The dock or float was strong enough only to accommodate light outboard motorboats and the like that would tie up there for temporary purposes.

As the Jesting drifted west she came sufficiently close to the Peters float and dock to tempt those aboard to there tie up the Jesting, in spite of her size, encumbering gear and debris, although it was apparent that this would impose a strain upon the Peters equipment which it was not constructed to sustain.

On this subject Marshall's testimony is candid. He said at the time he estimated the wind force to be 50 or 60 miles and that the waves were 2 to 3 feet high; nonetheless he and Patnod put two lines out on the Peters float. Thus:

"Q. Didn't you know as an experienced seaman and a man around boats that a 59 ton vessel in a 60 mile an hour gale could not possibly be held by a lightly constructed place like Peters? A. Certainly I know that, but any place in a storm—we are trying to save a boat."

In dealing with the Peters claim, it will be the view of this court that the election to tie up was not forced upon Marshall or Patnod in any real sense; that while the decision to risk such an expedient was made under difficult and trying circumstances, it can scarcely be thought to have been arrived at *in extremis*.

Incidentally, there is testimony on the part of Peters that one or more men who were present on the latter's property sought by gestures and calling, to induce the men on the Jesting not to tie her up, but they in turn say that they did not hear or observe any such efforts.

That which happened to the Peters property is thus described by the man in charge (Mentione) as follows:

"They fast on the float, and after a while they pull the whole business, they wreck everything, the float, three floats and the ramp, everything pulled out over there, and I had quite a few rowboats, outboard job, and they dragged everything complete. They wrecked the whole business."

He said that the Jesting arrived at about 9:00 o'clock and the damage as above described was complete by 10:40; incidentally that the Jesting also sank one of the Peters vessels called the Pilot. As to the force of the wind at this time, the witness said,

"About 75, 80, 90, because it was steady. You know, it wasn't a real 100-mile steady, but 90, 95 and 80, but the 100-mile stayed five minutes or ten minutes, and stopped, but it come down after a while, but when it was real 100, it pulled everything."

The Jesting eventually moved away from the Peters structures, carrying with her the floats, the ramp and other pieces of debris and the wreckage of small boats.

She continued on her westerly course and her next adventure was a collision with the motorboat Jolo which was said to have been anchored in the vicinity of 27th Street and Emmons Avenue, namely, to the west of the Peters property. Her owner says that he was on board and observed the Jesting moving west and it then turned north and struck his boat, pinning the latter up against the bulkhead. This, of course, was not a controlled maneuver on the part of the Jesting because she was caused to swing to the north by a cross-wind under the effect of which she later landed at the bulkhead to which reference has just been made.

This claimant stated that the wind was blowing at 30 to 40 miles an hour at the time of the collision.

The Jesting finally fetched up at the said bulkhead where she was made fast. It is in connection with that happening that the claim is made by Falcone, as owner of the motor cruiser Marian F, having a length of 35½ feet with a 9 foot beam and a draft of 3½ feet.

In connection with the making fast of the Jesting at the bulkhead, an anchor chain was carried ashore by two of the members of the crew either over and across the deck of the Marian F, or before the latter boat came to the bulkhead; it is testified to by Marshall that the said anchor chain banged up against the structure (cabin?) of the Marian F, and this is the damage asserted by Falcone as the owner of that boat.

The latter testified that his craft was at the bulkhead when the Jesting arrived, while Marshall says that the Marian F came in afterward and was brought under the anchor chain, which by then had been rigged to the bulkhead, by Falcone.

It is difficult to resolve this issue in view of the conflict in testimony, because Falcone called two witnesses who agreed with him in saying that the Marian was already in place at the bulkhead when the Jesting arrived. It is also difficult to believe that such experienced men as were handling the petitioner's vessel, even under the stress of heavy weather then prevailing, would have carried an anchor chain across the Marian and placed it in a position to damage her housing as she rose and fell in the waves. In other words, the testimony is almost precisely in balance but the slender margin of persuasion probably lies with the claimant; not that there is a disposition to disbelieve Marshall, but perhaps in the preoccupation of the moment and under the conditions prevailing, it could be that he is honestly mistaken.

There was much time wasted in the trial, and some space consumed in the briefs for claimants, on the subject of the Coast Guard Regulations concerning anchoring in the Federal Anchorage Area and the weight and size of anchors required. None of these contentions applies to the petitioner or the Jesting II since she was docked in or at the Garrison Yard or property, not anchored in the reserved space.

Since it is found and decided that the Jesting II was properly and adequately moored on November 21, there remains but to discuss the claims from the standpoint of exoneration.

■ *Garrison Claim.* The attempt to prove negligence on the part of petitioner has failed, and exoneration from that claim is granted.

■ *Peters Claim.* So far as this claimant can establish damage by the Jesting II as distinguished from storm damage caused by conditions afloat and ashore on November 25, 1950, it should be permitted to do so. This on the theory that such damage as the Jesting II inflicted on the claimant's property was not inevitable. But for putting the lines on the Peters float or deck, for all that is shown in the record, the yacht would have passed clear. True, she must have been close to the dock, and was drifting slowly, but the testimony would not support a finding that the harm would have been done even though the lines had not been rigged on the Peters dock or float.

The latter action should not be characterized as negligent; it was done in the exercise of judgment by competent and skilled men who functioned so as to win the admiration of Garrison; his training and special skills in such matters are not disputed.

As between the petitioner, whose yacht inflicted the damage, and Peters who was helpless to prevent it, and since the result came from some exercise of choice, it seems clear that it is the former who must answer for the loss sustained.

■ *Falcone Claim.* Without adding to what has been said concerning the closeness of the choice, his claim must be sustained, only however to the extent of such damage as can be shown to have resulted to the superstructure or cabin, and its supports.

■ *Cacace Claim.* The striking of this claimant's vessel by the Jesting II while she was not under control and was the prey of natural forces beyond her capacity to thwart, was an accident, pure and simple, for which no responsibility can be held to attach, under familiar

rules and decisions. As to this claim, the petitioner is exonerated.

As to Limitation, it has been the effort to make clear that the petitioner is entitled to the benefit of the Statute, 46 U.S.C.A. § 183, and a decree embodying the foregoing decision is to be settled on notice.

This decision is deemed to embody necessary Findings and Conclusions.