Matter of the Petition of **NEW JERSEY BARGING CORPORATION (DEL.), a corporation, for exoneration from or limitation of liability as owner of THE PERTH AMBOY NO. 1.**

United States District Court
S. D. New York.

May 18, 1956.

See, also, 135 F.Supp. 97.

Gay & Behrens, New York City, Edward J. Behrens, James A. Hageman, Charles H. Lawson, New York City, of counsel, for petitioner.

Fennelly, Eagan, Nager & Lage, New York City, William P. Lage, New York City, of counsel, for claimants-respondents, Point Lookout Ass'n et al.

Dow & Symmers, New York City, William Warner, New York City, of counsel, for claimants-respondents Orlando J. Bradley et al.

CASHIN, District Judge.

This is a limitation proceeding for exoneration from liability or limitation of liability by the petitioner, New Jersey Barging Corporation, as owner of the barge Perth Amboy No. 1.

Findings of Fact

1. The Perth Amboy No. 1, a tank barge of 1,022 gross tons, 204' long, constructed of steel, with the capacity of 15,600 barrels, at about 5:30 P. M. on September 26, 1954, tied up at T. A. D. Jones & Company's loading pier located in the New Haven Reach just south of the Tomlinson Bridge. The Perth Amboy No. 1 was under time charter to the McWilliams Blue Line and manned by one Johansen, petitioner's employee and a certified tankerman. Johansen, after connecting the hose of the barge to the dock pipe line for the purpose of receiving a cargo of No. 6 fuel oil, called the pump room (located over 800 feet from the pier) via the loading pier phone. He was told to come to the pump house, where he was informed that pumping would not start until 9 P. M. that night.

2. At about 8:15 P.M. Johansen was informed by the pump man that he was ready to start pumping oil into the barge. Johansen returned to the barge and signaled the pump man that he was to start pumping. Sometime after 11 P. M. Johansen observed that the No. 2 and 4 tanks were full and opened the valves to the No. 1 and 5 tanks. He then went below and fell asleep. It was Johansen's duty and responsibility to inform the pump house when to stop pumping.

3. Sometime after 1 A. M. on September 27th the pump man, after trying in vain to reach Johansen by the telephone located on the pier, contacted the night watchman who went to the pier, saw oil overflowing from the barge, turned off the dock valve and roused Johansen. Almost 2,000 barrels of oil overflowed from the Perth Amboy No. 1 into the water surrounding the Jones loading pier.

4. Johansen pumped back a quantity of the oil to the shore tanks from his barge which had been overladen. At approximately 6 A. M., in accordance to schedule, the tug Saratoga picked up the Perth Amboy No. 1 and towed it down to Devon, Connecticut, the destination of the oil cargo. Johansen made no effort to contact his employers.

5. At approximately 9 A. M. Charles Irwin, manager of petitioner's supply and distribution division, at his office in Perth Amboy, New Jersey, received a phone call from the McWilliams Blue Line office in New Haven, informing him of the existence of the "oil spill" in New Haven. Petitioner's Port Captain Robert Kingston, at the same office, was immediately informed and shortly thereafter proceeded to Devon, Connecticut, accompanied by the two other members of the barge crew. Kingston was an experienced mariner and Port Captain who had served as Master of oil tankers and other vessels. Kingston arrived at Devon sometime after 1 P. M. Kingston met Mr. Kellers, manager of the New Haven Towing Co., an affiliate of McWilliams Blue Line, who gave him some of the details of the spill. Kingston also interviewed Johansen on the barge, discharged him and left the barge in care of the two tankermen who had come with him. He then proceeded to New Haven where he arrived sometime after 2 P. M.

6. The oil spill, as observed by Captain Kingston at this time, spread one-quarter of a mile north and one-quarter of a mile south of the loading pier and extended out from shore for an average distance of approximately 75 feet. The natural tendency of oil to spread on water had been aided by two changes of tide and restricted somewhat by a light west wind which tended to hold it close to the shore.

7. Kingston, after some discussion with Kellers and on Kellers' recommendation, employed a Mr. Clark of the New Haven Shipyards to furnish men, boats and equipment to endeavor to clean up the oil by the use of a detergent. The procedure was to spray the degreasing solvent on the oil which would cause it to sink. Kingston then endeavored to order the degreasing solvent from the Penetone Company in New Jersey but was unsuccessful (it was then after 5 P. M.) and did not get his order placed until the next day. The detergent did not arrive in New Haven until 2 A. M. on the morning of September 29th. Meanwhile Mr. Clark spent that entire day (September 28) rounding up crews and preparing a boat and equipment for the spraying operation. Mr. Clark started the spraying operation on the morning of September 29th and continued it both from a boat and from trucks on the shore as the weather and circumstances permitted, to October 14, 1954. This operation, while effective where the oil was thin, required many sprayings to affect places where the oil was heavy. Much damage was caused to property on the shoreline even before the spraying operation got underway.

8. The petitioner spent over $6,000 in this effort to mitigate the damage caused by this oil spill. The only other method of mitigating the damage was to endeavor to confine the oil to the area of the spill. Even before Captain Kingston arrived at the scene in New Haven this oil spill had spread to such an extent as to make any effort to confine it impracticable and impossible.

Conclusions of Law

I. Petitioner is not entitled to exoneration but is entitled to limitation of liability.

On the evidence in this case there can be no question as to the negligence of the tankerman Johansen, and that the immediate result was the oil spill. There is no issue, therefore, either in law or fact as to the in rem liability of the Perth Amboy No. 1. The East Indian, 2 Cir., 62 F.2d 242. On the other hand Johansen was a certified tankerman and there is not a scintilla of evidence to show that he was not completely qualified and competent as such prior to the night of the oil spill.

In opposing petitioner's request for limitation, the claimants rely on the al-

leged negligent conduct of petitioner's managing agents after they received notice of the oil spill. The real issue in this case, therefore, is narrowed down to actions and decisions of Captain Kingston.

Claimants charge Kingston with neglect in that he should have sought expert advice, should have attempted to confine the oil by means of artificial barriers and should have acted with greater speed. In the opinion of the Court all of these charges are for the most part the result of well-exercised hindsight.

Kingston's failure to seek expert advice or to attempt to confine the oil is perhaps best justified by the testimony of the claimants' own expert, Davis. Davis testified, in effect, that the greatest danger from an oil spill was the possibility of fire, and that spraying the oil with a detergent, as was done, was the best method of removing that danger. He also testified that the only other possible way of dealing with the situation which confronted Kingston was to try to confine the oil and that the method of confinement and the degree of success, and even the possibility of accomplishing it to any degree depended, mainly, on the area of water covered by the spill.

The fact was that by the time Kingston arrived in New Haven the oil spill had spread far beyond the limits of feasible confinement even by the standards (which we think ignored many factors) which we derive from Davis' testimony. The only conclusion that can be drawn from Davis' testimony is that if Kingston had sought his advice Davis would have gone to New Haven, observed the condition and advised Kingston to have the oil sprayed. Kingston made that decision for himself.

Insofar as the speed with which Kingston acted is concerned, it is our opinion, even fortified as it now is by hindsight, that Kingston's decision to go to New Haven, including his stopoff at Devon, before he undertook to do anything about the spill, was prudent, reasonable and dictated by necessity. Subsequent delays in putting into effect the course of action decided upon were due to circumstances beyond Kingston's and petitioner's control.