Petition of NEW YORK TRAP ROCK CORPORATION, as owner of THE scow PRALL W. LAMBERT, in a cause of exoneration from or limitation of liability.

PORT OF NEW YORK AUTHORITY,
Libellant,

v.

RED STAR TOWING & TRANSPORTATION CO., Respondent.

United States District Court
S. D. New York.
April 14, 1959.

Hagen, Johnson & Quarto, Henry C. Eidenbach, Nelson J. Johnson, New York City, for petitioner, New York Trap Rock Corp., Hill, Rivkins, Middleton, Louis & Warburton, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for libellant-claimant, Port of New York Authority, Donald M. Waesche, Jr., John De Roos, New York City, of counsel.

Macklin, Speer, Hanan & McKernan, New York City, for respondent, Red Star Towing & Transp. Co., Martin J. McHugh, New York City, of counsel.

Holtzmann, Wise & Shepard, New York City, for claimant, Lipsett Steel Products Co., Inc., Frank P. Broz, New York City, of counsel.

LEVET, District Judge.

The libel of the Port of New York Authority (hereinafter called "Port Authority") against Red Star Towing & Transportation Co. (hereinafter called "Red Star") and the proceedings commenced by New York Trap Rock Corporation (hereinafter called "Trap Rock") as owner of the scow Prall W. Lambert (hereinafter called "Lambert") for exoneration from or for limitation of liability, wherein Port Authority and Lipsett Steel Products Co., Inc. (hereinafter called "Lipsett") are claimants, have been consolidated for trial.

On December 22, 1954, the Lambert, moored by Red Star, careened and damaged a certain pier, known as the Navy

Finger Pier, located at Newark, New Jersey. Said pier was owned by the United States of America and was under lease to Port Authority, which had, in turn, subleased it to Lipsett.

The Port Authority, libellant, sues respondent, Red Star as owner and/or operator of the Tug Roslyn. More particularly, Port Authority alleges that it holds a lease from the United States of a certain pier located in New Jersey and that, in turn, it leased the pier to Lipsett. At the time of the incident concerned, Lipsett, as lessee, was in possession. Port Authority further alleges that Red Star, without authorization, moored the Lambert, owned by Trap Rock, at this pier and while so moored without authorization it careened and struck the pier, causing damage thereto.

The answer of respondent Red Star to the libel consists of denials and of an affirmative allegation to the effect that the act complained of was not due to the fault of Red Star.

Trap Rock's petition for exoneration from or limitation of liability alleges among other things:

1. That the Lambert was not unseaworthy;

2. That it was not negligent;

3. That the accident was fortuitous and unforeseeable and that the damage which caused the sinking of the Lambert was from an unknown means;

4. That there was no consent, privity or knowledge on the part of Trap Rock with respect to the accident; and

5. That the value of the Lambert was only $500.

In the limitation proceeding, Port Authority, after denials, interposes a claim against the Lambert and its owners, Trap Rock, and asserts that when the Lambert capsized it struck the claimant's pier, thus causing damage thereto, and that this damage was without negligence or fault on the part of the claimant—that is, Port Authority—but was due to the fault and neglect on the part of the petitioner, Trap Rock, and of the Lambert and those in charge of her, as follows:

1. That the Lambert was moored without consent or approval and in spite of directions and warnings of Port Authority not to do so;

2. That the Lambert was a trespasser on the leased premises of Port Authority;

3. That the captain of the Lambert failed to keep his boat properly pumped out or to examine her to determine whether she was leaking;

4. That the Lambert was unseaworthy.

Other claims as a basis of liability are asserted but none of them have even colorable foundation.

Lipsett was made a party to the limitation proceeding and asserted a claim which alleges that the damage to the pier was due to the neglect of Trap Rock, the Lambert and those in charge of her, in substance as follows:

1. That Lipsett leased the said pier from Port Authority;

2. That the Lambert was moored at this pier without Lipsett's permission or approval in spite of directions issued "to barge owners and to others" not to do so;

3. That the Lambert capsized while lying at said pier because of (a) unseaworthiness and (b) negligence of those in charge of her and that when capsizing she struck against claimant's pier (apparently Lipsett's pier) and caused damage.

As to the basis of Lipsett's claim, it, like the Port Authority, alleges among other things:

1. That the mooring was without consent or approval of Lipsett in spite of directions and warnings not to do so;

2. That the Lambert was a trespasser on the leased premises of said claimant;

3. That the captain of the Lambert failed to keep his boat properly pumped out or to examine her to determine whether she was leaking;

4. That the Lambert was unseaworthy.

It appears that Lipsett seeks damages for loss of use of the pier, while the Port Authority claims loss for damages to the

pier structure. All questions as to the amount of damages, if any, were reserved.

The petition for exoneration or limitation and the claims by the respective parties in these proceedings as pleaded are based upon admiralty and maritime jurisdiction of the United States.

After hearing the testimony of the parties, examining the exhibits, the pleadings, briefs and proposed findings submitted by counsel,[1] this court makes the following Findings of Fact and Conclusions of Law:

### Findings of Fact.

1. At all times hereinafter mentioned, Port Authority was and still is a body corporate and politic, created by compact between the States of New York and New Jersey with the consent of the Congress of the United States, and was and is the joint and common agency of the States of New York and New Jersey created for the purpose of developing the Port of New York, and is duly authorized by both states to plan, effectuate, establish, acquire, construct, rehabilitate, develop and improve, own, control, operate and maintain terminal and transportation facilities within the Port of New York District, including marine terminals and piers, and has an office and place of business in the County of New York, City and State of New York, within this district.

2. At all times hereinafter mentioned, Red Star was and still is a corporation organized and existing under and by virtue of the laws of the State of New York, with an office and place of business in the County of New York, City and State of New York, within this district, and the said Red Star was the owner and operator of the Tug Roslyn and the employer of the master and crew thereof.

3. At all times hereinafter mentioned, petitioner, Trap Rock, was and still is a corporation organized and existing under and by virtue of the laws of the State of New York, with an office and place of business in the County of New York, City and State of New York, within this district, and at all times hereinafter mentioned, the Lambert was owned by Trap Rock.

4. At all times hereinafter mentioned, Lipsett was and still is a corporation organized and existing under and by virtue of the laws of the State of New York, with its office and place of business in the County of New York, City and State of New York, within this district.

5. On or about September 28, 1948, the United States leased to the Port Authority certain lands and property located in the County of Essex, City of Newark, State of New Jersey, more particularly described in the said agreement and lease, including, among other things, a wharf and pier known as the Navy Finger Pier, by which lease and agreement the libellant, Port Authority, was under obligation and responsibility to protect, preserve, repair and maintain the aforesaid Navy Finger Pier against an injury such as is here involved. (Exhibit 11.)

6. Pursuant to the terms of said lease, Port Authority spent certain sums of money in rectifying the condition of the pier as a result of the capsizing of the Lambert.

7. On or about September 1, 1954, Port Authority as lessee subleased to Lipsett a portion of the said Navy Finger Pier, including berth 27 thereof, for a period of one month, and thereafter the said lease was continued on a month-to-month basis and was in full force and effect on December 21 and 22, 1954. (See Exhibits 12 and 13.)

8. On or about December 20, 1954, the Lambert was properly loaded with approximately 753 tons, or 558 cubic yards, of rock screenings at Trap Rock's Tompkins Cove, Haverstraw, New York plant. Prior to the loading, some 10″ of water were in her hold. She was pumped out, reinspected and found to have 2″ of water and to be in a normal condition fit to tow.

9. The Lambert, built in 1926, was 112 feet long, approximately 34 feet wide,

---

1. No proposed findings were submitted by Lipsett.

with a height at the sides of approximately 10 feet, and a draft of approximately 9½ feet. She had a capacity of 550 to 600 cubic yards.

10. The Lambert had not been generally recaulked since October 4, 1949, though certain repairs and recaulking were done on July 22, 1952, August 19, 1952 and September 30, 1954.

11. On December 21, 1954, the Lambert, loaded as aforesaid, was towed to Pier 72, North River, which is known as the "Market."

12. At about 10:00 p. m. on December 21, 1954, the Tug Roslyn, under the command of Maurits Ostergren, master, picked up the Lambert and at about 11:00 p. m. began towing her with two other scows, to wit, Vanderbilt and Saturn, to Pier B, Jersey City, New Jersey. According to Ostergren, no untoward or unusual situation appeared. The Lambert appeared to be in good operating condition. At this point at or about midnight of December 21, 1954, Harold C. Stebbins, Jr., mate, took over the operation of the Tug Roslyn and the tow, including the Lambert; at 2:30 a. m. on December 22, 1954, the tug left the Lambert at berth 27 at the Navy Finger Pier, Newark, New Jersey. There, the Lambert was properly moored to the dock, a double line being tied from the stern and a double line being tied from the bow, the bow facing west and the starboard side being against the berth or pier. A deck hand from the tug boarded the scow to assist in handling the lines. Stebbins testified that he saw nothing unusual about the condition of the scow at the time of the mooring. The other two scows were then taken to Brill Street, Newark, by the Tug Roslyn. At the time of the mooring of the Lambert at berth 27, the tide was near high or flood; the weather was clear; there was no sea either at this time or previously during the voyage.

13. At about 5:40 a. m. on December 22, 1954, the Tug Roslyn, still under the command of Stebbins, returned to the Navy Finger Pier and prepared to take on the Lambert for transmission to Bogota on the Hackensack River. Stebbins planned to place the tug on the starboard side of the Lambert. According to him, the Lambert at this time was on an even keel and the tide was on the ebb. The Lambert's stern line, attached to the pier, was loosened, the Tug Roslyn nosed its bow between the pier and the Lambert and backed away in order to pull the stern of the Lambert away from the pier. The Lambert's bow line remained tied to the pier. When the tug ceased propulsion, it appeared to Stebbins that the Lambert was not operating normally but was affected by some unusual resistance. Then the deck hand of the tug asked the scow captain, who had come on deck to assist in the operation, whether there was any water in the scow. The scow captain said he did not have much, or something to this effect, but was instructed to make a sounding, which he did, and reported 3 feet of water. Thereupon, Stebbins directed the scow captain to abandon the scow and take his clothing aboard, which he did immediately. As soon as the scow captain jumped aboard the Tug Roslyn, the tug was forced to cast off its line to the Lambert in order to avoid involvement with the apparently capsizing scow. At this time, the bow line from the Lambert was still fast to a pile or post on the pier. The scow rocked back and forth and then sank with its starboard side descending below the level of the water at the pier. The port side of the scow moved up over the pier, hung a while and then slipped off into the water, but settled so that a portion of the rail was above the water.

14. After Red Star and Trap Rock made observations of the sunken scow, Trap Rock directed Merritt, Chapman and Scott to raise her. At this time it was impossible to observe from above that portion of the scow which might indicate any cause of sinking. The scow was raised, pumped out and towed to the Hudson River Yards of Trap Rock at Newburgh, New York.

15. At the Hudson River Yards at Newburgh, on January 5, 1955, a survey was made by Alexander C. Wilkie, surveyor and appraiser. By this survey it appeared that there was a large hole ap-

proximately 7″ x 22″ in the first side plank below the top log on the starboard side of the Lambert, approximately 20 feet from the bow and at or about the loaded water line. It was the opinion of Wilkie, and I so find, that this hole was produced by some outside force entering through the wall or hull of the scow at the point mentioned. The plank of the scow at this point was approximately 6″ in thickness, 12″ wide and about 20 feet long.

16. The weights in tons and the kind of material carried by the Lambert on its trips for the six months prior to December 22, 1954 were as follows:

| Loaded | Tons | Materials | Cu. Yds. |
|---|---|---|---|
| 6/17/54 | 819 | 1½ stone | 655 |
| 6/24 | 757 | Sand | 631 |
| 6/29 | 821 | Sand | 684 |
| 7/7 | 830 | ⅜ stone | 691 |
| 7/17 | 802 | Screenings | 594 |
| 7/23 | (422 | ¾ stone | 615) |
|  | (355 | Screenings | ) |
| 8/5 | 780 | Sand | 650 |
| 8/11 | 632 | Rip rap | 505 |
| 9/20 | (225 | 1½ stone | 653) |
|  | (568 | ¾ " | ) |
| 9/27 | 775 | Screenings | 574 |
| 10/7 | 851 | Screenings | 630 |
| 10/14 | (455 | ¾ stone | 667) |
|  | (346 | ⅜ " | ) |
| 10/22 | (325 | 1½ stone | 550) |
|  | (348 | ¾ " | ) |
| 10/29 | (427 | 1½ " | 682) |
|  | (409 | ¾ " | ) |
| 11/12 | 827 | 1½ " | 661 |
| 11/15 | (539 | 1½ stone | 661) |
|  | (276 | ¾ " | ) |
| 11/24 | 744 | 1½ " | 594 |
| 12/3 | 584 | 1½ " | 468 |
| 12/8 | (260 | ⅜ screenings | 599) |
|  | (458 | ¾ " | ) |
| 12/20 | 753 | Screenings | 558 |

17. Inspections of the Lambert at the time of arrival at Trap Rock's quarry for loading on her last ten trips prior to the accident indicate the following amounts of water:

December 18, 1954 ............10″
December 1, 1954 ............None
November 23, 1954 ..........8″
November 12, 1954 ............None
October 28, 1954 ...........None
October 21, 1954 .............None
October 13, 1954 .............None
October 6, 1954 .............None
September 24, 1954 .........4″
September 19, 1954 ..........None

(See Exhibits 12 and 15)

In my opinion, this record does not warrant the conclusion that the Lambert

was subject to "progressive leakage," as claimed by Port Authority.

18. It appears that as a rule the Lambert was pumped once a day whether loaded or light and that there was usually about 2″ of water in the corner, which is normal for a scow of this type. (See interrogatory 24 and answer)

19. I find that Trap Rock has not overcome the presumption of negligence arising out of the careening of its scow upon the Navy Finger Pier. This result is necessitated by reason of Trap Rock's failure to explain the cause of the Lambert's sinking. The court is left with no other alternative in view of the wholly-unexplained accident.

20. Trap Rock has established to my satisfaction that the mooring of the Lambert at the Finger Pier, the careening of the Lambert upon the Finger Pier and the resulting injury to the Finger Pier occurred without its privity or knowledge.

21. Joseph J. Frame, a wharfinger employed by the Port Authority, testified that during the last week of August, 1954, he telephoned Red Star, asked for the then chief dispatcher and stated that Port Authority was going to lease berth 27 to Lipsett on September 1, 1954, and that they, Red Star, were no longer to lie up scows at this berth. He further testified that at about the same time he called Trap Rock, asked for Mr. McFarland or McPartland (the transportation manager of Trap Rock at that time) and gave the same message. Mr. McPartland denies that there was any such telephone call or that he had any such message or information. Likewise, Robert W. Sanders of Red Star, who was general office manager in August, 1954, testified that no notice came to him of any such preclusion from berth 27 as that to which Frame testified. However, I am inclined to believe that the telephone calls to Red Star and Trap Rock were in fact made.

22. Item 500 of the Rules and Regulations promulgated by Port Authority with respect to its facilities at Port Newark is as follows:

"No water craft shall be docked or berthed at or made fast to any pier, wharf, quay, bulkhead, dolphin, mooring rack or other structure constituting a public wharf or a part of a public wharf, or in any dock, slip, basin or other waterway adjacent to any such structure except at the location assigned to such water craft by the Port Authority, or in such a manner as to endanger unreasonably or be likely to endanger unreasonably persons or property."

Item 480 of the Rules and Regulations is as follows:

"If a berth is desired for working railroad floating equipment, lighters, barges, floating cranes, elevators and other small craft on a temporary basis, application shall be made to the superintendent."

Red Star had a copy of these Rules and Regulations in its possession.

23. No permit for mooring the Lambert at berth 27 of the Finger Pier was sought or obtained by Red Star on the occasion in question. No notification concerning the presence of the scow was given by Red Star either to Port Authority or to Lipsett.

24. The unauthorized mooring of the Lambert, as aforesaid, was not compelled by any circumstance of necessity, but, on the contrary, constituted an exercise of choice on the part of Red Star for its own convenience.

25. There is a proximate causal relationship between the mooring of the Lambert at the Finger Pier and the subsequent damage to said pier by the careening of the Lambert.

### Discussion.

Jurisdiction, at least in respect to the libel against Red Star, is apparently based on Title 46 United States Code Annotated § 740, which in part is as follows:

"§ 740. Extension of admiralty and maritime jurisdiction; libel in rem or in personam; exclusive remedy; waiting period

"The admiralty and maritime jurisdiction of the United States shall

extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.

"In any such case suit may be brought in rem or in personam according to the principles of law and the rules of practice obtaining in cases where the injury or damage has been done and consummated on navigable water * * *"

Prior to the adoption of the Admiralty Extension Act of 1948, quoted in part above, admiralty jurisdiction in general did not extend to injuries caused by a vessel to persons or property on the land (where navigational aids were not involved), and where the cause of action arose upon the land the state law was applicable. See The Admiral Peoples, 1935, 295 U.S. 649, 651, 55 S.Ct. 885, 79 L.Ed. 1633; The Plymouth, 1865, 3 Wall. 20, 36, 37, 70 U.S. 20, 36, 37, 18 L.Ed. 125; Cleveland Terminal and Valley Railroad Company v. Cleveland Steamship Company, 1908, 208 U.S. 316, 320, 28 S.Ct. 414, 52 L.Ed. 508; Ex parte Phenix Insurance Company, 1886, 118 U.S. 610, 618, 7 S.Ct. 25, 30 L.Ed. 274.

The denial of admiralty jurisdiction where the injury was done to persons or property situated upon land, even though caused by a vessel situated on navigable waters, had certain anomalous effects, described in House Report No. 1523, March 8, 1948, as follows:

"As a result of the denial of admiralty jurisdiction in cases where injury is done on land, when a vessel collides with a bridge through mutual fault and both are damaged, under existing law the owner of the bridge, being denied a remedy in admiralty, is barred by contributory negligence from any recovery in an action at law. But the owner of the vessel may by a suit in admiralty recover half damages from the bridge, contributory negligence operating merely to reduce the recovery. Further, where a collision between a vessel and a land structure is caused by the fault of a compulsory pilot, the owner of the land structure is without remedy for his injuries since at law a compulsory pilot is not deemed the servant of the vessel's master or owner. Homer Ramsdell Transportation Co. v. [La] Compagnie Generale Transatlantique (182 U.S. 406, 416 [21 S.Ct. 831, 45 L.Ed. 1155]). But if the vessel sheers off the land structure to collide with another vessel in the vicinity, the owner of the second vessel, by an in rem proceeding in admiralty, may recover full damages, for the wrong is viewed as that of the vessel itself and compulsory pilotage is no defense. The China ([7 Wall. 53, 68] 74 U.S. 53, 68 [19 L.Ed. 67]). * * *" U.S. Code Congressional Service 1948, 80th Congress, Second Session, vol. 2, p. 1899.

Referring to the then proposed Admiralty Extension Act, the House Report further stated:

" * * * The bill under consideration would correct these inequities as a result of providing that the admiralty courts shall take cognizance of all of them." U.S.Code Congressional Service, 1948, supra.

The purpose of the proposed Act was described in Senate Report No. 1593 as follows:

### "Purpose Of The Bill

"The bill would provide for the extension of admiralty and maritime jurisdiction to all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land. In addition, the bill would permit suits to be brought in rem or in personam according to the principles of law and the rules of practice obtaining in cases where the injury or damage has been done and consummated on navigable water." U.S.Code Congressional Service, 1948, supra.

■ It seems clear from the foregoing that the Admiralty Extension Act had a twofold effect:

1. It made a new, concurrent remedy in admiralty available for an already existing action at common law. See United States v. Matson Nav. Co., 9 Cir., 1953, 201 F.2d 610, 617; All America Cables & Radio, Inc. v. The Dieppe, D.C.S.D.N.Y., 1950, 93 F.Supp. 923, 924.

2. It made admiralty rather than common law "principles of law" and "rules of practice" applicable to actions commenced under the Act. 46 U.S.C.A. § 740.

■ These proceedings have been commenced in admiralty, and maritime jurisdiction has been invoked; therefore, maritime law should govern. See J. B. Effenson Company v. Three Bays Corp., 5 Cir., 1956, 238 F.2d 611, 615.

Certain principles such as liability for negligence predicated upon the breach of a duty of care and rights of a quasi-contractual nature arising out of unjust enrichment are common to both actions at law and actions in admiralty. See Archawski v. Hanioti, 1956, 350 U.S. 532, 535, 536, 76 S.Ct. 617, 100 L.Ed. 676; Diamond State Tel. Co. v. Atlantic Refining Co., 3 Cir., 1953, 205 F.2d 402, 407; Chicago, Burlington & Quincy R. Co. v. The W. C. Harms, D.C.S.D.Tex.1954, 134 F.Supp. 636, 640.

■ However, certain principles of the common law are not recognized in admiralty and it is the duty of courts sitting in admiralty to apply maritime law "free from inappropriate common-law concepts." Kermarec v. Compagnie Generale Transatlantique, 79 S.Ct. 406, 409. See also The Max Morris, 1890, 137 U.S. 1, 11 S.Ct. 29, 34 L.Ed. 586; The Lottowanna, 1874, 21 Wall. 558, 88 U.S. 558, 22 L.Ed. 654.

■ The legal concept of trespass arising out of the unauthorized entry upon or use of property of another is to some extent recognized in admiralty. See The Chancellor, 2 Cir., 1929, 30 F.2d 227, 228, 229; Diamond State Tel. Co. v.

Atlantic Refining Co., 3 Cir., 1953, 205 F.2d 402, 406.

It has been held, for example, that even in the absence of negligence the owner of a yacht is liable for damage to a float and dock sustained as a result of an apparently unauthorized mooring thereto during a storm when harm to the float and dock was foreseeable. In re Banks' Petition, D.C.E.D.N.Y.1955, 133 F.Supp. 276.

Here, Red Star, for reasons of its own, chose to moor the Lambert, its tow, at berth 27 of the Finger Pier without authorization, knowing that the pier had in fact been withdrawn from such public use. By this act, Red Star exposed the pier to the hazards of ship and sea, which Port Authority had expressly declined to continue to assume. There was no question of a mooring dictated by necessity, such as involved in the Banks case, supra. The mooring was one of convenience; in fact, it was a wilful and capricious choice on the part of Red Star in derogation of Port Authority's prohibition against public mooring. Without this violation of Port Authority's direction, this damage from this source to the pier could not have occurred.

■ The act was wilful and the perils to which the act thus subjected the pier must be presumed to have been contemplated. A wrong occurred; the party wronged is entitled to a remedy. "The power of the admiralty courts to adjudicate comprehends every variety of maritime torts which may be the foundation of a legal claim for compensation * *." Aurora Shipping Co. v. Boyce, 9 Cir., 1911, 191 F. 960, 969.

■ Red Star's conduct fixed the Lambert in the position from which the injury could and did occur. The Port Authority, by reason of its obligation under the public contract with the United States, was obligated to repair the pier. Consequently, Red Star, whose conduct placed the object which did the wrong in the location from which it endangered and damaged the pier, must answer to

the Port Authority for the loss. See In re Banks' Petition, D.C.E.D.N.Y.1955, 133 F.Supp. 276.

■■ Since Port Authority was under a contractual obligation to the United States to repair the pier, and in fact did so, it became subrogated to the rights of the United States to recover damages for the injury here involved. As was stated in Gerseta Corporation v. Equitable Trust Co., 241 N.Y. 418, 425–426, 150 N.E. 501, 504, 43 A.L.R. 1320:

"Subrogation, an equitable doctrine taken from the civil law, is broad enough to include every instance in which one party pays a debt for which another is primarily answerable, and which in equity and good conscience should have been discharged by the latter, so long as the payment was made either under compulsion or for the protection of some interest of the party making the payment, and in discharge of an existing liability."

To the same effect, see Liberty Mutual Insurance Co. v. Borsari Tank Corp., 2 Cir., 1957, 248 F.2d 277, 289; In re Federal Facilities Realty Trust, 7 Cir., 1955, 220 F.2d 495, 503. The right of subrogation is cognizable in admiralty. See The Seaboard No. 93, D.C.S.D.N.Y.1934, 7 F. Supp. 362, 363.

Accordingly, Port Authority is entitled to recover from Red Star the fair and reasonable cost of repair of the Navy Finger Pier necessitated by the unauthorized mooring and subsequent careening of the Lambert onto said pier.

■ In respect to the claims of Port Authority and Lipsett against Trap Rock, in my opinion, Trap Rock has failed to overcome the presumption of negligence arising out of the collision of its scow with the Finger Pier. See The Buffalo, 2 Cir., 1932, 56 F.2d 738, 739; The Cullen No. 32, 2 Cir., 1932, 62 F.2d 68, 70, affirmed 290 U.S. 82, 54 S.Ct. 10, 78 L.Ed. 189; The Havana, 2 Cir., 1937, 89 F.2d 23, 24; Patterson Oil Terminals, Inc. v. The Port Covington, D.C.E.D.Pa. 1952, 109 F.Supp. 953, 954, affirmed 3 Cir., 1953, 205 F.2d 694; Maryland Shipbuilding & Dry-Dock Company v. Patapsco Scrap Corp., D.C.Md.1959, 169 F. Supp. 605, 606.

As in The Buffalo, supra, Trap Rock has not produced the scow captain to testify as to the condition of the Lambert or the scow captain's activities in respect thereto after leaving Tompkins Cove and prior to the accident.

It appears that the Lambert was built in 1926; that it had not been generally recaulked since October 4, 1949; and that inspections on November 23, 1954 and again on December 18, 1954 indicated abnormal amounts of water in her hold as follows:

November 23, 1954—8″—starboard bow
December 18, 1954—10″—port stern

On each of these occasions, the scow was pumped out, reinspected prior to departure and found to have normal amounts of water as follows:

November 24, 1954—2″—port stern
December 20, 1954—2″—port stern

The Lambert appeared to be in a seaworthy condition at the time it left Trap Rock's Tompkins Cove quarry on December 20, 1954. However, two days elapsed between then and the time she careened onto the Finger Pier. From approximately 2:30 a. m. until 5:40 a. m. on December 2, 1954, she was moored at the Finger Pier, out of sight of the Tug Roslyn, which had left to take two other scows to their destination at Newark. Under these circumstances, Trap Rock owed a duty to make some showing that the careening was not due to fault on its part. It has failed to do so.

While it appears that an examination of the scow after the capsizing disclosed a hole 7″ x 22″ on her starboard side (SM 240), it remains a matter of conjecture whether this hole was the cause or the result of the careening onto the pier. If, as claimed by Trap Rock, the hole was caused by a heavy impact from the outside prior to the careening, the scow captain undoubtedly would have been aware of it and should have taken steps to avoid

the sinking. If, on the other hand, the hole resulted from the careening, this provides no explanation of the accident which would satisfy Trap Rock's burden of adducing some proof to establish its freedom from fault. Accordingly, Trap Rock's petition for exoneration must be denied.

 However, I have concluded that Trap Rock's petition for limitation of liability must be granted. In my opinion, neither George J. Smith, Trap Rock's marine superintendent, nor Daniel de Noyelles, its loading foreman, was negligent in permitting the Lambert to undertake its voyage of December 20, 1954. Whatever the scow captain or those on the Tug Roslyn may thereafter have done or known would not constitute privity or knowledge on the part of Trap Rock. See Petition of Tracy, 2 Cir., 1952, 194 F.2d 362; In re Petition of New Jersey Barging Corp., D.C.S.D.N.Y.1956, 144 F. Supp. 340; Petition of United States, D.C.S.D.N.Y.1947, 69 F.Supp. 538; Benedict on Admiralty, Vol. 3, p. 387 et seq.

Conclusions of Law.

1. This court has jurisdiction of the subject matter of these proceedings and of the parties hereto.

2. These proceedings are within the admiralty and maritime jurisdiction of this court.

3. Trap Rock's petition for exoneration must be dismissed.

4. Trap Rock's petition for limitation of its liability to the value of the Lambert should be granted.

5. Subject to the foregoing limitation of liability with respect to Trap Rock, Port Authority is entitled to an interlocutory decree against Red Star and Trap Rock for damages suffered to the Navy Finger Pier as a result of the careening of the Lambert onto it.

6. Subject to the foregoing limitation of liability, Lipsett is entitled to an interlocutory decree against Trap Rock for damages, if any, for loss of use sustained as a result of the careening of the Lambert onto the Navy Finger Pier

7. Port Authority and Lipsett are entitled to a provision in the said interlocutory decree or decrees providing for the reference to a Commissioner of the damages to which they are entitled, with costs and interest, if any, to be determined upon the entry of the final decree or decrees herein.

Submit interlocutory decree on notice in accordance with the foregoing.