NISSAN MOTOR CORPORATION IN U. S. A. and Nissan Motor Corporation in U. S. A. t/o/u and t/u/o Tokio Marine Management, Inc., Plaintiffs,

v.

MARYLAND SHIPBUILDING AND DRYDOCK COMPANY, Defendant.

Civ. No. H–80–3027.

United States District Court, D. Maryland.

Aug. 3, 1982.

Richard J. Magid, William F. Ryan, Jr. and Whiteford, Taylor, Preston, Trimble & Johnston, Baltimore, Md., for plaintiffs.

William R. Dorsey, III, Bruce E. Alexander and Semmes, Bowen & Semmes, Baltimore, Md., for defendant.

ALEXANDER HARVEY, II, District Judge:

This admiralty case raises questions concerning the rights and obligations of two adjoining owners of business properties located in an industrial area of the Port of Baltimore. The principal plaintiff, Nissan Motor Corporation in U.S.A. (hereinafter "Nissan"),[1] is here asserting that activities conducted at defendant's shipyard have caused substantial damage to plaintiff's business operations.

Nissan imports and stores on its property new Datsun automobiles and trucks. Maryland Shipbuilding & Drydock Company (hereinafter "Maryland Shipbuilding"), the defendant, operates a ship repair and drydock facility on piers and property adjacent to Nissan's facility. The complaint, as amended, alleges that smoke and spray paint emanating from defendant's property have damaged Nissan's new vehicles. Nissan is here seeking substantial damages and a permanent injunction. Admiralty jurisdiction exists because the offending emissions have come from vessels located on navigable waters and docked at defendant's piers.

## I

### History of the litigation

Pretrial proceedings in this case have been extensive. The original complaint, which was filed on November 25, 1980, alleged damage to Nissan's cars and trucks caused by spray paint from painting operations conducted at defendant's shipyard. Following a hearing the same day that the complaint was filed, Judge Miller of this Court entered a Temporary Restraining Or-

der prohibiting defendant from conducting painting operations at its shipyard. With the consent of counsel, the Temporary Restraining Order was extended until the Court could rule on Nissan's motion for a preliminary injunction, which likewise sought to prohibit only defendant's painting operations.

Following an evidentiary hearing, this Court, in an oral opinion rendered on February 27, 1981, denied plaintiffs' motion for a preliminary injunction and dissolved the Temporary Restraining Order previously entered. This Court ruled that Nissan had not met its burden of proving irreparable damage and that plaintiffs had an adequate remedy at law to recover for any damage that might have been sustained by vehicles which had allegedly been sprayed by paint emanating from defendant's shipyard. The Court concluded that if there were future spray paint damage to Nissan's vehicles, the damages could be readily ascertained and proved at the trial of the case. Although plaintiffs had sought to prove four spray painting incidents occurring during 1980, the Court found that plaintiff had not shown that defendant was responsible for two of the incidents. The Court further found that any damage caused by the other two incidents was minimal and noted that Nissan had shipped the supposedly damaged vehicles to its dealers without notifying them of any damage and without correcting the alleged damage. Accordingly, the Court concluded that there had been no showing of any continuing trespass and of any continuing damage to Nissan's vehicles which would support the entry of a preliminary injunction.

Thereafter, plaintiffs amended their complaint to add new claims based on damage to Nissan's vehicles caused by smoke emanating from defendant's shipyard. It was alleged that soot and ash discharged from smokestacks of vessels located at defendant's shipyard damaged the exterior paint-

---

1. Nissan has brought this suit to its own use and to the use of its insurer, Tokio Marine Management, Inc.

ed surface of Nissan's vehicles. A renewed motion for a Temporary Restraining Order was then filed. Following a hearing which did not involve the taking of testimony, the Court, in an oral opinion rendered on September 18, 1981, granted in part and denied in part plaintiffs' renewed motion for a Temporary Restraining Order. The Court indicated that the Temporary Restraining Order which it had decided to enter was intended to do no more than maintain the status quo with as little harm as possible to each side until the case could be brought in for trial. The Court rejected plaintiffs' request that the Temporary Restraining Order require that defendant prohibit vessels from discharging smoke when their boilers were fired up in preparation for their leaving the shipyard. Maryland Shipbuilding had raised substantial questions concerning its liability for emissions caused by third parties located on its property, and the Court indicated that these and other questions would be addressed and decided when plaintiffs' renewed motion for a preliminary injunction came on for hearing.

In the Temporary Restraining Order entered on September 18, 1981 to maintain the status quo, defendant was required to promptly notify all vessels located at its shipyard that the discharge of soot, ash and pollutants from their smokestacks might cause harm to vehicles located on adjoining property, and that such vessels might then be held responsible for any damage caused through discharge. Further provisions of the Order required (1) that defendant notify vessels at its shipyard to obtain permission from personnel of defendant before operating engines or boilers of a vessel in a fashion which might result in the discharge of smoke; (2) that defendant should give

notice to counsel for plaintiffs at least four hours before any such operation of engines or boilers; and (3) that defendant should present to the Court and to counsel for plaintiffs a proposed plan for minimizing the discharge of smoke from the smokestacks of vessels at defendant's shipyard.[2] The Order of September 18, 1981 was to remain effective until the Court ruled on plaintiffs' renewed motion for a preliminary injunction.[3]

On October 15, 1981, plaintiffs filed a third motion for a Temporary Restraining Order, based on allegations of new smoke damage incidents. Following a conference with counsel, the Court, on October 16, 1981, denied this third motion for a Temporary Restraining Order.

Extensive discovery was then undertaken by the parties, a final pretrial conference was held, and a Pretrial Order was filed on May 25, 1982. The parties have agreed that, pursuant to Rule 65, F.R.Civ.P., the trial of this action on the merits would be consolidated with the trial on plaintiffs' renewed motion for a preliminary injunction. It has further been agreed that the trial of the case should be bifurcated. Liability for permanent injunctive relief and for damages would be tried first. Depending upon the results of that initial trial, the amount of any damages to be awarded would be decided at a later trial.

One of the significant preliminary questions presented in this litigation was whether the Court would be hearing this case under its admiralty jurisdiction or under diversity jurisdiction. Plaintiffs' original complaint asserted that its claims were admiralty claims under Rule 9(h), F.R.Civ.P.[4] Contending that admiralty jurisdiction did not exist, defendant timely requested a jury

2. Defendant complied with this portion of the Order by exploring the feasibility of various possible solutions to the problem, including the use of an external cleaning device and the use of a light distillate fuel during so-called "light off" operations. Reports were rendered to the Court by defendant on October 8 and November 13, 1981. Since none of the proposed solutions were feasible, the Court did not subsequently modify the Temporary Restraining Order.

3. Since the parties later agreed to consolidate the trial on the merits with the trial on plaintiffs' renewed motion for a preliminary injunction, it was agreed that the Temporary Restraining Order would remain in effect until the Court ruled on the liability issues.

4. The later amendments to the complaint added additional claims asserted under Rule 9(h).

trial. In a Memorandum and Order entered on May 28, 1982 after discovery had been completed, the Court ruled that admiralty jurisdiction as to all of plaintiffs' claims exists here under the Admiralty Jurisdiction Act, 46 U.S.C. § 740. The Court concluded that any paint damage sustained by Nissan's vehicles had been caused by spray painting operations conducted from a floating crane barge owned by defendant or by spray painting performed on vessels located on navigable waters. The Court further ruled that claims for smoke damage were based on emissions of soot and ash by vessels located in navigable waters and berthed at defendant's piers.

Pursuant to this ruling of May 28, 1982, the case came on for trial before the Court sitting without a jury. Numerous witnesses testified and many exhibits were admitted in evidence. Findings of fact and conclusions of law, pursuant to Rule 52(a), F.R. Civ.P., are contained in this opinion, whether or not expressly so characterized.

## II

### *The background facts*

Nissan is a major importer of automotive vehicles into the United States. Using its own vessels, it lands vehicles at various ports, stores them and then distributes them to retail dealers in its various regions. In the mid-1970's, Nissan, which was then using Portsmouth, Virginia for the importation of its vehicles into the Middle Atlantic area, indicated an interest in securing a facility in the Port of Baltimore. Learning of this interest, the Maryland Port Administration (the "MPA") surveyed various possible sites for such a facility. Eventually, certain property owned by Weyerhaeuser Lumber Company was located immediately adjacent to Maryland Shipbuilding's shipyard property. Following various negotiations among the parties, MPA leased the property from Weyerhaeuser and sublet it to Nissan for a five-year period commencing in January 1978. In early February 1978, Nissan commenced its operations.

When vehicles are unloaded from Nissan's vessels, they are stored on three lots located on the property, the main lot (which is immediately adjacent to the Maryland Shipbuilding property), the so-called "ball park lot" and the so-called "Swift lot." Various repair and other work is performed on the vehicles before they are shipped to dealers. Some 7,000 to 8,000 vehicles are shipped each month, with the average stay of a vehicle being from a few days to two weeks. Thus, some 90,000 to 92,000 vehicles per year move through the Nissan facility in Baltimore.

Maryland Shipbuilding has operated its ship repair and drydock facility on piers and property adjacent to the Nissan property for over fifty years. Ocean-going vessels tie up at Maryland Shipbuilding's piers and are worked on there. Some of the work may involve painting the exterior surfaces of vessels and their appurtenances. Other work may be done on the boilers and engines of the vessels which come to the shipyard for repairs. Boilers which are repaired must of course be shut down, and when the work is completed, the boilers must be fired up again so that the vessel may leave the pier and go back to sea. It is this so-called "light off" or start up process which causes black smoke to be emitted from stacks of the vessels located at the shipyard. When the wind is from the north or the northwest, this black smoke may be blown onto Nissan's property and onto the vehicles stored there. On these occasions, soot and other particulate may settle on the exterior surfaces of Nissan's new vehicles.

Nissan had been at its new location in the Port of Baltimore for only a few months in 1978 when it began to encounter problems resulting from the shipyard's operations next door. In early July of 1978, smoke and soot discharged from the smokestack of a vessel located at the shipyard was blown onto Nissan's lot and particulate came to rest on the exterior surfaces of the vehicles stored there. A similar incident occurred in August 1978. Inspections of the vehicles convinced Nissan that sulphuric acid contained in the particulate had damaged the exterior surface of its vehicles. Claims were accordingly made by Nissan's then

insurer against Maryland Shipbuilding, which eventually led to the filing of a civil action in this Court on April 11, 1980. *Yasuda Fire & Marine Insurance Company, Ltd. v. Maryland Shipbuilding & Drydock Company*, Civil No. H–80–877. That action was later settled between the parties.[5]

On November 25, 1980, Nissan filed this action. The original complaint alleged damage to vehicles allegedly caused by spray painting operations conducted at defendant's shipyard. Four separate paint incidents allegedly occurring in 1980 were initially relied upon. Thereafter, the complaint was amended on several subsequent occasions to include smoke incidents allegedly occurring in 1978, 1980 and in 1981 and additional paint incidents allegedly occurring in 1981.

After the plaintiffs had completed the presentation of their evidence at the trial, the defendant moved, pursuant to Rule 41(b), F.R.Civ.P., for a dismissal of all plaintiffs' claims. This motion was granted in part and denied in part.[6]

### III

#### *The relief sought*

Plaintiffs are here seeking substantial damages for each of the smoke and paint incidents and also a permanent injunction. Plaintiffs ask that the provisions of the Temporary Restraining Order of September 18, 1981 should be made a part of the permanent injunction. In addition, plaintiffs have asked the Court to order (1) that defendant require that all vessels, equipped with and capable of lighting off with distillate fuels, use such fuels during light off operations at defendant's shipyard; (2) that defendant furnish a competent watch with direct communications to the engine room of a vessel which is lighting off so that a vessel can take immediate steps to correct a smoke condition; (3) that defendant require

that vessels which wish to light off and depart promptly from defendant's shipyard use an emission control device during periods of emission of black smoke; (4) that defendant require that a vessel which refuses to use such a device during light off operations with bunker C fuel be required to conduct such light off operations at the one pier furthest from Nissan's facility; (5) that defendant notify appropriate Coast Guard personnel prior to Coast Guard testing of vessels that the discharge of soot, ash and particulate from vessels at the shipyard may cause harm to vehicles at Nissan's facility; (6) that defendant be prohibited from conducting exterior spray painting operations at its Pier 5 and at both sides of the building slip area; (7) that defendant be prohibited from conducting exterior spray painting operations when the wind is blowing toward Nissan's facility; and (8) that defendant be required to erect and maintain protective shielding materials to catch paint during spray painting operations.

### IV

#### *The issues*

The principal dispute in this case involves the smoke damage incidents. Many more of these are claimed to have occurred than the paint damage incidents, and therefore most of the evidence presented at the trial related to the dispute concerning these smoke incidents.

Moreover, the smoke claims present issues which are quite different from the paint claims. The evidence discloses that the spray painting which allegedly caused the damage to Nissan's vehicles was done by employees of Maryland Shipbuilding. Therefore, if liability is established insofar as the paint claims are concerned, Maryland Shipbuilding is responsible. On the other hand, the smoke emissions emanated from

---

**5.** However, it has been agreed that Nissan may rely on the facts pertaining to these incidents in seeking to establish liability in this related case.

**6.** The Court dismissed plaintiffs' claims based on paint damage allegedly sustained in 1980.

The Court ruled, *inter alia*, that plaintiffs had not met their burden of showing that vehicles on Nissan's lot had in fact been damaged as a result of the four 1980 paint incidents relied upon.

vessels located at shipyard piers. Therefore, agents and employees of various third-party shipowners were the primary actors in causing smoke to be discharged from the vessels' smokestacks and to be carried eventually by the wind onto Nissan's property.

Plaintiffs are here contending that Maryland Shipbuilding is legally responsible for the damage to Nissan's vehicles which occurs when soot and particulate emanating from defendant's shipyard is blown onto Nissan's property, even though defendant's employees were not the ones who fired up the boilers and caused black smoke to be emitted into the air. Maryland Shipbuilding contends that it cannot be held responsible for these smoke emissions which are the result of actions taken by officers and crews of different vessels which have come to defendant's facility for repairs. Defendant argues that it was not negligent because it had no control over the vessels themselves which are owned and operated by independent third parties and that it does not operate the engines and boilers of these vessels. Defendant further argues that applicable principles of trespass and nuisance do not establish liability on its part for the acts of these third parties. Defendant points out that both Nissan and Maryland Shipbuilding are located in a heavily industrial area in the Port of Baltimore where smoke and other pollutants can be expected and relies on the fact that it has occupied its property for over fifty years, during which time vessels at its piers have constantly caused emissions of black smoke. Insofar as the smoke damage claims are concerned, these are the questions of liability which must be addressed here.

In seeking a permanent injunction and damages, plaintiff is relying on theories of (1) negligence, (2) trespass and (3) nuisance. This admiralty case is therefore unusual in that it involves the application of land-based principles of law which are concerned with the rights and obligations of adjoining property owners. Plaintiffs contend that in

the absence of a clearly defined principle of maritime law, an admiralty court should apply the appropriate state law. Plaintiff therefore urges that the Maryland law of trespass and of nuisance is exclusively controlling in this case. Defendant asserts that this admiralty court should look to the general common law and in particular to the Restatement for guidance. This choice of law question must be considered first.

V

*The law to be applied*

The parties agree that, in view of the Court's ruling that this case arises under its admiralty jurisdiction, federal maritime law must be applied. *See Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959); *Green v. Pope & Talbott, Inc.*, 328 F.Supp. 71 (D.Md. 1971), *aff'd*, 459 F.2d 365 (4th Cir. 1972). The dispute as to the law to be applied in this case concerns the sources to which the Court should look in determining the applicable federal maritime law. Relying on Gilmore & Black, *The Law of Admiralty*, §§ 1–17 (2d Ed.1975) and *Bell v. The Tug SHRIKE*, 332 F.2d 330 (4th Cir.) *cert. denied*, 379 U.S. 844, 85 S.Ct. 84, 13 L.Ed.2d 49 (1964), plaintiffs contend that in the absence of a clearly defined principle of maritime law, an admiralty court should apply the appropriate state law. Accordingly, it is urged by plaintiffs that the Maryland law of trespass and of nuisance, and not the general common law, should be applied by the Court in this case.[7]

This Court concludes that the recent Fourth Circuit decision of *Byrd v. Byrd*, 657 F.2d 615 (4th Cir. 1981), is controlling in this case. In *Byrd*, the Fourth Circuit declined to follow Virginia's rule of interspousal immunity in an admiralty case arising out of a collision between two pleasure craft. Noting that there were no federal cases which considered the question of interspousal immunity or established a federal admiralty rule determining it, the Court

---

7. Counsel agree that the law of negligence is essentially the same whether Maryland law or    federal maritime law is applied.

posed the issue as "whether we should establish a federal admiralty rule governing interspousal immunity in maritime tort suits or whether we should look to applicable state law to provide the rule of decision." 657 F.2d at 617. The Court concluded that a state law, even though it did not contravene an established principle of admiralty law, would nevertheless not be applied where its adoption would "impair the uniformity and simplicity which is a basic principle of the federal admiralty law * * * "[8]

▆ Applying the *Byrd* case here, this Court concludes that it should look to the general common law and in particular to the Restatement, Second, Torts (hereinafter "the Restatement") in determining the law of trespass and nuisance to be applied in this case. Even though a particular admiralty case might involve the rights and obligations of two adjoining property owners in a port, general maritime law should be uniform so that vessels in different ports would not have to subject themselves to the vagaries of local law. This principle was very recently recognized by the Supreme Court in *Foremost Insurance Co. v. Richardson*, —— U.S. ——, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982). In that case, the Supreme Court held that a complaint alleging a collision between two pleasure boats falls within the admiralty jurisdiction of the federal courts. Noting that "the primary focus of admiralty jurisdiction is unquestionably the protection of maritime commerce," the Court concluded that the "petitioners take too narrow a view of the federal interest sought to be protected." *Id.* at ——, 102 S.Ct. at 2658–59. Recognizing the breadth of this federal interest, the Court held that this interest can be fully vindicated only if all operators of vessels on navigable waters "are subject to uniform rules of conduct". *Id.* "Moreover, the smooth flow of maritime commerce is promoted when all vessel operators are subject to the same

duties and liabilities." *Id.* Quoting from the lower court opinion, 641 F.2d 314, 316 (5th Cir. 1981), the Supreme Court concluded that the goal of promoting the smooth flow of maritime commerce would be frustrated if the duties and obligations of non-commercial navigators traversing navigable waters flowing through more than one state would differ " 'depending upon their precise location within the territorial jurisdiction of one state or another.' "

Similarly, if different ports were to have different local rules concerning whether legitimate maritime activity amounted to a trespass or a nuisance, the smooth flow of maritime commerce would be adversely affected. The need for uniformity and simplicity in federal admiralty law is particularly underscored in this case. Only Maryland and New York apply a principle of strict liability in a trespass case, and New York limits strict liability to cases of trespass caused by affirmative acts rather than omissions. Restatement, Appendix, § 166, pp. 181–183. Thus, in imposing liability for a non-intentional, non-negligent trespass caused by a failure to act, Maryland apparently stands alone.[9] Under these circumstances, vessels could be expected to avoid Maryland ports if Maryland law, under circumstances such as those present in this case, would impose liability on them without any showing of fault.

The earlier Fourth Circuit decision in *Bell v. The Tug SHRIKE, supra,* is not to the contrary. In that case, the Court applied Virginia law because there was no controlling maritime law nor any "clear cut common law rule * * * " 332 F.2d at 334. Thus, the Court there held that it would apply local law where no other law existed. In this case, there is a general body of common law principles of trespass and nuisance recognized by the Restatement and elsewhere. Accordingly, there is a body of law to which this Court should look in seeking to achieve uniformity.

---

**8.** The Court also held that, in the alternative, a state law should not be applied where its application would defeat an otherwise meritorious maritime cause of action. This alternative ground is not applicable in this case.

**9.** According to the Restatement, Appendix, § 166, p. 182, the "weight of American authority now strongly supports the Restatement position."

Other federal cases which have considered claims based on theories of trespass or nuisance indicate that the concept of strict liability is foreign to admiralty law. In both *The CHANCELLOR*, 30 F.2d 227 (2d Cir. 1929) and *In Re New York Trap Rock Corp.*, 172 F.Supp. 638 (S.D.N.Y.1959), the Courts dealt with claims for damage done by trespassers in terms of negligence concepts. *In Re Banks' Petition*, 133 F.Supp. 276 (E.D.N.Y.1955), involved an intentional trespass. If strict liability were the principle to be applied in those three cases, it would not have been necessary for these Courts to analyze the facts to determine whether negligent or intentional conduct was present.

In *S. C. Loveland, Inc. v. East West Towing, Inc.*, 608 F.2d 160 (5th Cir. 1979), *cert. denied*, 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980), the Fifth Circuit affirmed the trial court's finding in an admiralty case that a bridge owner had been negligent in failing to take sufficient action to protect the bridge from being damaged by a drifting barge. After determining that maritime law applied and after noting a dearth of applicable maritime precedent, the Court looked to the Restatement and the general common law, rather than merely to decisions of the forum state in deciding upon the rule to be applied. Various sections of the Restatement dealing with the law of nuisance were cited by the Court (608 F.2d at 167–168) and standards of nuisance law were applied by the Court in determining whether liability had been established.

Accordingly, this Court concludes that the Maryland law of trespass and nuisance should not be applied in this case because to do so would undermine the uniformity and simplicity of the maritime law.[10] Although there is no established maritime rule, there are well-recognized common law principles of trespass and nuisance as set forth in the Restatement. In *Hurst v. Triad Shipping Co.*, 554 F.2d 1237, 1248 (3d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977), the Third Circuit cited the Restatement as a useful source of law for novel questions in admiralty. The Restatement rules of trespass and nuisance will therefore be applied here.

## VI

### *Smoke damage*

The evidence clearly establishes and defendant does not dispute the fact that smoke from vessels docked at piers located on defendant's property is on occasion carried by the wind onto Nissan's adjoining property. The result is that from time to time soot and other particulates land on Nissan's new vehicles which are stored on its various lots before being shipped to dealers. These particulates may on occasion cause damage to the exterior painted surfaces of Nissan's vehicles. Under certain conditions of moisture, sulphuric acid is formed which has a corrosive effect on painted surfaces.

However, these are not regular, continuous occurrences. A number of different factors must combine before smoke emanating from defendant's property damages vehicles on Nissan's property. First, vessels which are ready to leave Maryland Shipbuilding's piers must fire up their cold boilers. Secondly, the vessels must be steamships and the fuel being used must be Bunker C, which contains higher proportions of sulphur than other types of fuel.[11] Thirdly, the wind must be blowing from the north or northwest so that smoke emitted from the vessel's stacks is carried across Nissan's property. Fourth, the weather cannot be too dry or too wet. If there is little or no moisture in the air or on the vehicles, the $SO_3$ contained in particulate

---

**10.** *State of Maryland v. Amerada Hess Corporation*, 350 F.Supp. 1060 (D.Md.1972), is not to the contrary. In that case, Judge Murray did not address the choice of law question presented here, undoubtedly because the Maryland law and the general law were the same.

**11.** On occasion, smoke from vessels using distillate fuels has caused fallout to be deposited on Nissan's property. However, the evidence does not indicate that there was resulting damage to Nissan's vehicles on those occasions.

emitted from the stacks is not converted into corrosive sulphuric acid. On the other hand, if it is raining, the solution is diluted or washed away so that it does not damage the paint surfaces of Nissan's vehicles.

### (a) The number of smoke damage incidents proved

Plaintiffs have alleged that they sustained damage to their property because of twelve separate smoke incidents occurring between early July of 1978 and mid-October of 1981.[12] However, the credible evidence discloses that on only seven occasions was there actual or potential damage to Nissan's vehicles caused by smoke emanating from vessels located at defendant's shipyard. On five occasions, the smoke or fallout was observed to be light or very light, and the vehicles were not washed because Nissan's employees determined that there had been no damage. These five incidents occurred on February 5, 1980; August 14, 1980; August 20, 1980; December 5, 1980 and August 27, 1981. Since there was no damage which occurred on these occasions, plaintiffs have failed to prove that it sustained any loss because of these emissions.

Of the seven incidents of smoke damage that were proved, five required merely the washing of vehicles while two required actual repainting of a number of the vehicles. The initial incident occurred on or about July 5, 1978 and involved smoke coming from the ASIA TRANSPORT, which was then docked at one of defendant's piers. Nissan's Port Manager, Nabih Kilada (hereinafter "Kilada"), observed that the smoke particulate had had a corrosive effect on the exterior surface of a number of new vehicles located on Nissan's lots. Accordingly, the vehicles affected were repainted.

This first smoke damage incident caused Nissan's employees to be particularly alert to future smoke emissions. When black smoke was observed coming from the vicinity of the shipyard, vehicles on the lot were inspected, and if fly ash was observed, they were promptly washed to avoid any permanent damage to the exterior surfaces. Some of the washings may have been unnecessary. However, under the circumstances, it was reasonable for Kilada to act as he did to prevent possible more serious damage if the fly ash remained on the vehicles for any extended period of time. Fly ash was observed on some of Nissan's vehicles, and a number of vehicles were washed as a result of the five smoke incidents occurring on August 18, 1978; November 28, 1979; August 23 and 24, 1981; September 15 and 16, 1981; and October 13 and 14, 1981. The major incident occurring on June 23–24, 1981 and arising as a result of smoke discharged by the GOLDEN GATE involved both the washing of vehicles and the later repainting of some of these vehicles because paint discoloration and etching had occurred. Since some painting was necessary, this incident will be treated as one of the two more serious occasions when it was necessary to repaint the vehicles because of particulate damage.

Defendant argues that plaintiffs have not proved that smoke emanating from vessels located at its shipyard caused damage to Nissan's vehicles. It is urged that fly ash, soot, dust and other types of particulate from various industrial sources caused or contributed to the fallout observed on Nissan's vehicles.

It is undoubtedly true that particulate emanating from various industrial sources in the general area fell on Nissan's property during the times involved here. On September 8, 1981 and September 21, 1981, fly ash was observed on vehicles in Nissan's lots, but no smoke was observed coming from defendant's property. On October 24, 1981, fly ash, observed on vehicles in one of Nissan's lots, had been deposited as a result of emissions from the DAPHNE, which was not berthed at one of defendant's piers but was located nearby on Bethlehem Steel Company's property.

In spite of this and other evidence to the contrary, this Court finds that on the seven occasions mentioned, particulate which em-

---

**12.** Some of the incidents occurred over a period of several days. Where the discharge of smoke began on one day and continued into the next, it has been counted as a single incident.

anated from the stacks of vessels located at defendant's piers did cause damage to Nissan's vehicles located on its property. The evidence produced by plaintiffs specifically linked emissions from vessels located at defendant's piers on the days in question to fly ash observed shortly thereafter on Nissan's vehicles. The Court further finds that on two occasions the fallout coming from defendant's property caused etching and discoloration of Nissan's vehicles. There is no doubt that a number of different contingencies had to occur at the same time before particulate coming from defendant's property would result in the creation of sulphuric acid which would eat into the exterior surface of Nissan's vehicles. But the evidence produced indicates to the Court that this actually did occur on two occasions and that on five other occasions Nissan was justified in washing the affected vehicles to avoid potential damage to the surface of the vehicles.

Thus, the cause of and the fact of damage has been proved here insofar as these seven smoke damage incidents are concerned. The more significant question in this case is whether Maryland Shipbuilding can be held legally responsible for this smoke damage.

#### (b) Negligence

As noted, the acts which led to the discharge by vessels of black smoke into the air and onto plaintiffs' property were not undertaken by agents or employees of Maryland Shipbuilding. Rather, various different vessels located at defendant's piers at different times emitted the smoke in question. These emissions occurred when cold boilers of steamships were fired up in preparation for the vessels' leaving defendant's shipyard following the completion of necessary repairs. This is the so-called "light off" procedure.

Focusing first on acts undertaken by members of the crew of the vessel, this Court finds and concludes that the discharge of black smoke by these vessels occurs without fault or negligence on the part of the ship. Steamships using Bunker C fuel by their inherent nature will emit black smoke during light off operations at a shipyard. No matter how experienced the operator, amounts of black smoke necessarily must be discharged during light off. Improper combustion occurs because it is not possible to maintain the proper temperature and the precise mixture of air and fuel to avoid black smoke when a cold boiler is fired up.[13] Certainly, vessel owners wish to avoid wasted fuel which results from improper combustion on these occasions, and their engine room operators are carefully trained. Nevertheless, in spite of efforts undertaken by shipowners, black smoke discharges are unavoidable on occasion when cold boilers of steamships using Bunker C fuel are fired up. The evidence does not disclose that these sporadic emissions violated any federal or state anti-pollution laws.

■ In any event, whether or not the exercise of due care by members of the crew of these vessels would prevent the discharge of black smoke, this Court finds and concludes that plaintiffs have not proved that defendant was negligent in failing to prevent the smoke emissions which caused damage to Nissan's vehicles. The evidence produced is insufficient to show that agents or employees of the shipyard negligently caused these smoke emissions. To establish that defendant was negligent, plaintiffs must prove that defendant's omissions or failures to act amounted to a lack of due care. Plaintiffs did not sue the shipowners, although certainly the vessels themselves could have been seized in this or some other port under admiralty process. Although this possibility was discussed at hearings and conferences in this case, plaintiffs have chosen instead to un-

---

13. A report prepared for the Federal Maritime Administration entitled "Applicability of Shoreside Air Quality Emission Laws, to Merchant Vessels in Port," (Report No. MA–RD–920–79055, July 1979), observed, inter alia, that "during cold startups and inspections required for maintenance, reliability, safety and certification by regulatory bodies, boiler emissions cannot be controlled." (pp. xi–xii) According to this Report, the reason is that marine boilers operate with poorer combustion and less than maximum efficiency while in port (p. 3–25).

dertake the more difficult task of proving that defendant was negligent by not acting to prevent acts of third parties which caused the damage in question. On the record here, this Court finds and concludes that plaintiffs have failed to prove that defendant's failure to act amounted to a lack of due care.

Plaintiffs argue that Maryland Shipbuilding had a duty to regulate and supervise the activities of ships located at its facilities and, in particular, all light off operations. It is urged that defendant should require certain vessels to light off with distillate fuels, should require light off operations to be conducted at the pier furthest from Nissan's facility or should require the use of an emission control device to be installed on the stack of each vessel during light off operations. Plaintiffs further contend that defendant should require that vessels should wait until the weather is dry or the wind is blowing in a certain direction before light off operations are undertaken.

Although procedures of this sort could conceivably be implemented, they are not practical and they are not economically feasible under the facts and circumstances here. It was therefore not unreasonable for defendant to fail to implement and enforce the regulations and requirements suggested by the plaintiffs. The captain and crew of each vessel had the responsibility for vessel operations, including its engine room. Personnel of the shipyard were not licensed by the Coast Guard and were therefore not permitted by law to conduct light off procedures. See 46 U.S.C. §§ 222–224, 229. Moreover, in the maritime industry, the amount of time a vessel remains in port at a shipyard is an extremely important consideration. When repair work on a vessel has been completed, its owner is anxious to go back to sea as soon as possible.[14] Where a shipowner required to delay for the periods of time when it would be necessary to implement requirements of this sort, they would simply take their work to some other yard than Maryland Shipbuilding's.

The evidence indicates that no other shipyard on the East Coast regulates light off operations in the manner suggested by the plaintiffs. The ship repair business is a highly competitive one, and Maryland Shipbuilding did not act unreasonably when it declined to regulate light off operations in the manner suggested by plaintiffs.

Through expert testimony and other evidence, plaintiffs sought to establish at the trial that the use of an external plume scrubber (or EPS) by vessels during light off activities would prevent fallout from being carried by the wind onto Nissan's property. This Court found that evidence unconvincing. No such device had ever been used in the industry previously. Defendant's evidence indicates that the EPS was impractical for the uses suggested, that it would be quite costly and that it would delay the departure of vessels which wished to be on their way after repairs were completed. This Court accordingly finds that the EPS was neither technically nor economically feasible as a solution to the problem.

Efforts by Maryland Shipbuilding to notify vessels of the problem caused by light off operations were not successful in halting the emissions. When the GOLDEN GATE incident first came to defendant's attention on June 23, 1981, representatives of the vessel were notified that black smoke was being blown onto Nissan's property. However, such notice did not persuade the captain and crew of the vessel that they should stop the light off operations then being conducted. Apparently, the captain was anxious to get under way and the black smoke emissions continued both on June 23 and June 24. Following the GOLDEN GATE incident in June of 1981, defendant changed its "Plant Information and Regulations" to request that their customers not "blow down boiler tubes or emit fallout" if the wind was out of the west, so that fallout discharged from vessels' stacks would not be carried over Nissan's adjacent premises. This had no effect in preventing fu-

---

14. Demurrage charges average from $15,000 to $25,000 per day. John G. Roemer, defendant's

Executive Vice President, estimated the cost of a one-day delay for a large vessel to be $50,000.

ture fallout on Nissan's property. There were smoke incidents in August 1981, in September 1981 and in October 1981, which caused damage to Nissan's vehicles. It is apparent that the vessel owners themselves made the decisions as to when they would fire up their cold boilers and depart.[15]

This Court finds that Maryland Shipbuilding acted reasonably during the times in question here. When defendant became aware of the extent of the problem, it included in its regulations the suggestion that light off operations not be undertaken when the wind was out of the west. It was required to do no more under all the circumstances here. On this record, plaintiffs have not met their burden of showing that it was the negligence of Maryland Shipbuilding which proximately caused the smoke damage sustained by Nissan's vehicles.

### (c) Trespass

Applying the general principles set forth in the Restatement, this Court finds and concludes that the facts here do not support a recovery based on a theory of trespass. Where a claim of one property owner against another is based on smoke damage, nuisance is the more appropriate theory to be applied.

A trespass is an invasion of one's interest in the exclusive possession of land as by entry upon it, while a nuisance is an interference with one's interest in the private use and enjoyment of the land which does not require interference with the possession. Restatement, § 821D, comment d. The facts here indicate that the invasion of Nissan's property by soot and ash did not amount to an interference with Nissan's exclusive possessory interest in the land. Rather, the smoke and the particulate fallout has interfered with Nissan's use and enjoyment of its property in connection with its business. Accordingly, the smoke invasion here would not amount to a trespass. See Borland v. Sanders Lead Co., 369 So.2d 523, 529 (Ala.1979).

Furthermore, even if the facts here were to be analyzed under a theory of trespass, plaintiffs would not be entitled to recover. Under the Restatement, liability results from an intentional entry onto another's land regardless of harm. § 158. Liability may also result from a trespass caused by negligence. § 165. No liability results from an unintentional non-negligent entry, even if harm is done. § 166. Thus, tortious conduct of some sort must be proved before a plaintiff in an admiralty case can recover under a theory of trespass.

The facts here disclose no tortious conduct by defendant or its employees which proximately caused the damage in question. There was no intentional act undertaken by defendant which caused particulate matter to be deposited on Nissan's vehicles. Furthermore, as discussed hereinabove, defendant was not negligent in failing to act in a way to prevent the discharge of smoke from vessels at its piers. At all times, defendant was conducting its business operations in the same manner as it had always done for the many years that it had occupied this location in the Port of Baltimore.

Relying on Maryland cases, plaintiffs contend that the invasion of the Nissan property by smoke emanating from defendant's property amounts to a trespass which establishes defendant's liability without regard to any fault on its part. However, it is not at all clear from the Maryland cases cited by the plaintiffs that an invasion of smoke blown from one property to another amounts to a trespass. Although both Baltimore Belt RR Co. v. Sattler, 100 Md. 306,

---

15. The Temporary Restraining Order of September 18, 1981 was entered before any final determination of liability had been made by the Court, and was expressly intended to maintain the status quo and minimize further damage to plaintiffs until the case could be brought on for trial. Although that Order provided that defendant should give permission to vessels before light off operations were undertaken, the decision was to be left to defendant's complete discretion to determine whether permission would or would not be given in a particular case. If a refusal to permit light off might affect defendant's business relationship with a customer, defendant was authorized under the Order to permit the light off operation, whereupon counsel for the plaintiffs were to be notified that the light off would occur.

59 A. 654 (1905) and *North Central RR Co. v. Oldenburg & Kelley, Inc.*, 122 Md. 236, 89 A. 601 (1914) permitted a recovery for smoke damage, it would appear that the law of nuisance was applied rather than the law of trespass. *Scott v. Bay*, 3 Md. 431 (1853) was a blasting case and is clearly distinguishable from the facts here. In any event, this Court has determined that the Maryland law is not applicable here but that in this admiralty case the principles enunciated by the Restatement are controlling.

Plaintiffs further rely on the fact that in its oral opinion of February 27, 1981, the Court, in denying plaintiffs' motion for a preliminary injunction, observed that plaintiffs would "probably be able to prove a trespass to the satisfaction of the trier of fact." However, that hearing dealt with paint damage rather than smoke damage. Moreover, at the time, there was pending before the Court defendant's request for a jury trial, and no ruling had been made as to whether admiralty law or Maryland law was controlling. Following a full trial and extensive briefing of the legal questions involved, this Court has now concluded that federal admiralty law applies and that plaintiffs have not proven that a trespass occurred when fallout from smoke emanating from the shipyard came to rest on vehicles located on Nissan's property.

### (d) *Nuisance*

Pursuant to the Restatement, liability under a theory of nuisance for the invasion of another's interest in the use and enjoyment of land results when the invasion is either intentional and unreasonable (§ 822(a)) or unintentional and otherwise actionable because negligent, reckless or an abnormally dangerous activity (§ 822(b)). However, pursuant to § 821F, liability under a theory of nuisance will attach only for "significant harm." In deciding whether "significant harm" is present, a court should consider various factors. Insofar as this particular case is concerned, these factors include consideration of the hypersensitive condition of Nissan's chattels, of the location, character and habits of the particular community and of the duration of the harm to plaintiffs and its gravity in comparison with the utility of the conduct of the defendant. *See* § 821F, comments d, e and g. The fact that Nissan occupied its land after the nuisance came into existence is also a factor to be considered in determining whether the nuisance is actionable. § 840D.

When these principles are applied to the facts of this case, this Court finds and concludes that Maryland Shipbuilding is not legally responsible under a theory of nuisance for damage caused to Nissan's vehicles by smoke discharged from vessels at the shipyard's piers. Significant harm, as defined by the Restatement, has not been proved in this case. The rights and privileges of Nissan pertaining to the use of its industrial property located next to defendant's shipyard must be considered in terms of the general standards of normal business operations in the Fairfield area of the Port of Baltimore and not in terms of the different standards resulting from the particular nature of Nissan's operations. Maryland Shipbuilding has done business at its present location in the Port of Baltimore for many years. Vessels have therefore been lighting off for an extended period of time, and black smoke has from time to time and for many years been blown onto the adjoining property, long before Nissan occupied the property in 1978. Before Nissan arrived, there had never been any claim that defendant's operations injured adjoining real or personal property. It was only when new cars were stored immediately adjacent to defendant's shipyard that claims for smoke damage were asserted. Thus, it is the peculiar nature of Nissan's business operations on the property combined with the smoke emissions which has created the problem. When fly ash comes to rest on the exterior surfaces of new vehicles and the proper amount of moisture is present, sulphuric acid is formed which has a corrosive effect on the painted surfaces of the vehicles. It is apparent, then, that the harm to the plaintiffs results only because of the hypersensitive nature of their chattels. *See Bradbury Marble Co. v.*

*Laclede Gas Light Co.,* 128 Mo.App. 96, 106 S.W. 594 (1907). The resulting damage to Nissan's vehicles could not have been foreseen by Maryland Shipbuilding which had never encountered problems of this sort with neighbors before and did not know that sulphuric acid from the smoke emissions would corrode the painted surfaces of new vehicles.

When the location, character and habits of the particular community are taken into account, it is clear that both Nissan's property and defendant's property are located in an industrial area. The zoning under the Baltimore City Zoning Ordinance is M–3, or "Heavy Industrial." Shipyards and similar operations are not permitted in either M–1 or M–2 zones, which are the only other two industrial classifications in the City of Baltimore. Since it is considered to have "heavy, nuisance producing characteristics," a shipyard must locate in an M–3 zone.

Within a radius of several miles of the Maryland Shipbuilding facility are chemical and pesticide plants, industrial refractories, paint manufacturers, oil refineries, power plants burning coal or heavy oil and other heavy industrial installations. Ships of all kinds are to be found in the surrounding areas of the Port.[16] Diesel tractor trailers and trucks serve the many businesses located in the harbor. Fly ash, soot, dust and other types of industrial fallout are characteristic of this particular community.

Thus, this is not a case involving the relative rights and obligations of a residential or light business use as compared to an industrial use. In this case, both users occupy industrial property, and both must accept the conditions normally characteristic of an industrial area. If normal occupants of the area would not be substantially annoyed or disturbed by the conditions complained of, "then the invasion is not a significant one, even though the idiosyncracies of the particular plaintiff may make it unendurable to him." § 821F, comment d. As the Court observed in *McMorran v.*

*Cleveland Cliffs Iron Co.,* 253 Mich. 65, 234 N.W. 163 (1931), at 234 N.W. 165:

> To restrain vessels engaged in navigation and interstate commerce from emitting smoke at the dock, to the annoyance of the plaintiffs, would not only interfere with the rights of navigation, but as well destroy the business carried on at the dock.

Another factor to be considered is the duration or frequency of the invasion, including the gravity of the harm to plaintiffs in comparison with the utility of the conduct of the defendant. § 821F, comment g. In this case, the invasions have been sporadic. In some four and one-quarter years since Nissan occupied the property in February 1978, there have been seven incidents causing some damage, or, on the average, one incident every seven months. Five of the incidents have required merely the washing of a number of the vehicles, while two have resulted in more serious damage requiring the repainting of some vehicles. The evidence indicates that if the vehicles are stored on the lots which are farthest from defendant's shipyard, fallout damage is minimized or eliminated. Other importers of foreign automobiles coat their vehicles with cosmoline, which is not removed until the unloading and storage process has been completed. Nissan's vehicles are completely unprotected when they are stored in its lots. The evidence indicates that if Nissan used cosmoline on its vehicles, damage from fallout would be further minimized, and the number of incidents would be lessened.

In this particular case, the utility of defendant's conduct outweighs the gravity of the occasional harm which Nissan has sustained. Ship repair work is obviously of great importance to the smooth flow of maritime commerce. Maryland Shipbuilding conducts a very substantial business in the Port of Baltimore. In 1981, it employed some 1750 persons; its payroll was in excess of $35 million; it purchased some $24 mil-

---

**16.** Black smoke has been observed emanating from the stacks of Nissan's own vessels which deliver the vehicles to this site.

lion worth of materials; and it paid taxes amounting to some $14.5 million. Unlike Nissan, Maryland Shipbuilding is not able to pick up and move its business operations to some other location in the Port.

Were Maryland Shipbuilding required to refuse repair work unless its customers agreed to submit to orders from the shipyard concerning light off operations, undoubtedly its business would suffer substantially. Nissan, on the other hand, on those few occasions each year when fallout would be deposited on some of its vehicles, will sustain economic loss of considerably lesser proportions. Furthermore, Nissan is better able to minimize the occasional damage that might be expected by undertaking protective measures which would not be unduly costly.

A further significant factor here is that Nissan occupied its property after the smoke emissions had been occurring next door for many years. Although the "coming to the nuisance" doctrine is not a complete bar to recovery, it is a factor of importance to be considered in a case of this sort. § 840D, comment c. Representatives of Nissan testified at the trial that they did not know that vessels located at shipyard piers emitted black smoke when they fired up their cold boilers prior to departing. Certainly, this important feature of this particular industrial area should have been known and would indeed have been revealed had Nissan properly investigated the property and its environs before entering into the sublease. Martin H. Richards, Nissan's national port operations manager, was the only representative of Nissan to inspect the property before it was occupied. In April 1977, he viewed the site for about an hour, principally from the pier located on the property. However, he did not notice what would have been obvious to anyone, namely that a shipyard was immediately next door. When asked later by his superior, Eugene D. Quinn, whether he was aware that there was a shipyard next to this facility, Richards replied in the negative and said that he was so busy walking the facility with MPA personnel that he did not pay any attention to the nature of the adjacent property. Had Nissan's representatives looked into the matter, they would have ascertained that vessels leaving the adjacent shipyard regularly emitted black smoke and that this smoke on occasion would be blown onto the property the leasing of which was being considered by Nissan.

Although there was no reason for Maryland Shipbuilding to have foreknowledge that smoke from vessels located at its piers would damage new automobiles stored on the adjacent property, Nissan, which was in the business of importing new vehicles and then storing them in the open, had every reason to know and appreciate the consequences of locating next to a business which would produce industrial fallout. In 1977, before Nissan occupied the property in Baltimore, there had been an ash type fallout emanating from a cardboard box factory located next to Nissan's facility in Jacksonville, Florida. Vehicles located there had to be washed because of these emissions, which, according to Richards, occurred over a period of thirty days. In spite of this previous experience, Nissan moved to the Baltimore facility in 1978 without any investigation at all of the nature of the adjacent shipyard operations and, in fact, without even knowing that a busy shipyard was located next door. In *Powell v. Superior Portland Cement, Inc.*, 15 Wash.2d 14, 129 P.2d 536 (1942), the Court held that one who voluntarily purchases property in a manufacturing community may not be compensated because of fallout "inseparable from industrial activity in that community and reasonably necessary or expectable in the conduct of lawful industrial operations therein * * *" 129 P.2d at 539. *See also, East St. Johns Shingle Co. v. City of Portland*, 195 Or. 505, 246 P.2d 554 (1952), and *Harden Chevrolet Co. v. Pickaway Grain Co.*, 27 Ohio Op.2d 144, 194 N.E.2d 177 (1961).

In sum, the facts here lead to the finding that plaintiffs cannot recover under a theory of nuisance because Nissan has sustained no significant harm, as that term

is defined by § 821F of the Restatement. The personal property affected was of a hypersensitive nature, peculiarly susceptible to damage from smoke emissions. The area was heavily industrial, and emissions of all kinds were regular occurrences. The utility of defendant's shipyard on balance outweighs the gravity of the occasional harm to Nissan's vehicles. Finally, Nissan occupied its property without adequate investigation of the area and voluntarily came to a location which had been subjected to smoke and other industrial fallout for many years. Under these circumstances, the law requires that plaintiffs rather than defendant should bear the loss caused by these emissions of smoke.

Plaintiff argues here that defendant should not be permitted to use its industrial property so as to injure its neighbor's business. What plaintiffs are essentially contending in this case is that Maryland Shipbuilding should make significant changes in its operations to its economic detriment merely because Nissan's new business has been opened next door and the shipyard's operations are on occasion incompatible with those of this new neighbor. The applicable law of nuisance does not require any such result. Accordingly, plaintiffs are not entitled to a recovery from defendant based on a theory of nuisance.[17]

## VII

### Paint damage

In their complaint, as amended, plaintiffs allege damage resulting from four spray painting incidents occurring in 1980 [18] and two occurring in 1981. As a result of rulings by the Court during the trial, only the two 1981 incidents remain for consideration.[19]

(a) *The number of paint incidents*

Plaintiffs contend that paint damage to Nissan's vehicles occurred on May 22–23, 1981 when the AMERICAN MERCHANT was being painted by shipyard personnel and that there was further paint damage occurring on August 26–27, 1981 when other vessels were being painted by defendant's employees. Defendant asserts that adequate proof has not been presented to show that its conduct caused any spray painting contamination of Nissan's vehicles. It is urged that paint from other sources may have caused the damage in question.

The credible evidence discloses that Nissan's vehicles were damaged on both of these two occasions in 1981 as a result of painting operations being conducted by defendant's employees. The evidence presented was sufficient to show that on the days in question defendant's employees were painting vessels located at the shipyard and that paint similar to that being used at the time was found on the exterior surfaces of Nissan's vehicles located on adjoining property. Thus, plaintiffs have sufficiently linked up the paint being used at the shipyard with that later observed on Nissan's vehicles, and has therefore proved by a preponderance of the evidence that acts of defendant's employees proximately caused the damage in question.

Moreover, the fact of damage has been proved as to both of these incidents. Unlike the 1980 incidents, the paint contamination in 1981 was considerable, and, as it had not done in 1980, Nissan corrected the condition before it shipped the affected vehicles to its dealers. According to Kilada, some 1700 cars were affected by the May incident and some 143 vehicles by the August incident. Thus, both the cause of and

---

17. In any event, plaintiffs would not be entitled to a recovery under a theory of nuisance because they have failed to prove fault on the part of defendant. As more fully discussed hereinabove, the invasion here was neither intentional and unreasonable (as required by § 822(a)) nor negligent, reckless or an abnormally dangerous activity (as required by § 822(b)).

18. It has been agreed that evidence concerning the 1980 incidents which was presented at the hearing held in February 1981 on plaintiffs' motion for a preliminary injunction would be a part of the record in this case.

19. Counts I through VIII of the original complaint, which alleged paint incidents occurring in 1980, were dismissed at the close of plaintiffs' case.

the fact of damage have been proved as to these two paint incidents occurring in 1981.

### (b) *Negligence*

In deciding whether Maryland Shipbuilding can be held legally responsible for the 1981 paint damage, this Court would note that the paint damage incidents present quite a different picture from the smoke damage occurrences. Unlike the smoke damage incidents, the paint damage to Nissan's vehicles were directly caused by employees of defendant. Thus, defendant was responsible for the acts which were performed by its employees acting within the scope of their assigned duties and which caused paint to be carried by the wind onto Nissan's vehicles. On the record here, this Court finds and concludes that defendant is legally responsible for the paint incidents which occurred in May and in August of 1981 and which caused damage to Nissan's vehicles.

Following the filing of the original complaint which sought damages for paint incidents which allegedly occurred in 1980, Maryland Shipbuilding took steps to ensure that its painting operations would not affect Nissan's vehicles. On November 26, 1980, explicit regulations were put into effect prohibiting spray painting of vessels berthed at Pier 5 or at the building slip area. In addition, personnel were cautioned to exercise extreme care in other areas of the shipyard to assure that exterior spray painting would be conducted in such a manner that no paint spray would pass onto Nissan's property. For some inexplicable reason, these regulations were not followed by defendant's employees on May 22–23, 1981 and again on August 26–27, 1981. John G. Roemer, defendant's Executive Vice President, readily conceded that painting of the AMERICAN MERCHANT in May was being done when it should not have been.[20] Roemer testified that some of his employees apparently misunderstood the regulations. Clearly then, defendant had knowledge of the likely danger and had told its employees how to avoid it. Nevertheless, Maryland Shipbuilding's personnel

failed to exercise due care in conducting the painting operations in question, and the paint damage promptly followed. This failure of defendant's employees to follow the shipyard's own regulations, which were specifically designed to avoid paint damage of this sort to Nissan's vehicles, amounted to negligence on the part of the defendant. Since this negligence was the proximate cause of the damage to Nissan's vehicles, plaintiffs are entitled to recover for the losses they thereby sustained.

Maryland Shipbuilding, of course, had ultimate control over the work its employees did. Unlike provisions of the regulations which related to possible smoke damage, Maryland Shipbuilding could enforce its directives which related to paint damage. Moreover, the record discloses that the painting restrictions could be and in fact were carried out with little extra cost or disruption to the shipyard's normal operations. Whereas any attempt to enforce the smoke regulations would undoubtedly have caused a loss of business for defendant, exterior painting could readily be scheduled at areas other than Pier 5 and the building slip area. The regulations were reasonable ones under the circumstances, and had they been followed, Nissan's vehicles would not have been damaged by paint on May 22–23, 1981 and again on August 26–27, 1981.

For these reasons, plaintiffs are entitled to recover from defendant for the paint damage sustained by Nissan's vehicles occurring in May and in August of 1981. The amount of these damages will be determined at a later proceeding.

### VIII

#### *Injunctive relief*

It is necessary to address plaintiffs' claims for injunctive relief separately. This Court has determined that Maryland Shipbuilding is liable in damages to the plaintiffs for damage caused to Nissan's vehicles by painting operations conducted on two separate occasions by defendant's employ-

---

**20.** The Court found Roemer to be an extremely credible witness.

ees. However, the Court concludes that plaintiffs are not entitled to a permanent injunction prohibiting future spray painting by Maryland Shipbuilding at its shipyard.

In deciding whether or not to grant permanent injunctive relief, a court should consider (1) the probability of irreparable injury to the moving party or whether there is an adequate remedy at law; (2) whether the balance of equities favors the moving party; (3) the public interest, if any, that is involved in the dispute; and (4) the merits. *Minnesota Public Interest Research Group v. Butz*, 358 F.Supp. 584, 625 (D.Minn.1973), *aff'd*, 498 F.2d 1314 (8th Cir. 1974).

Insofar as the paint damage claims are concerned, this Court finds and concludes that plaintiffs have an adequate remedy at law. *See Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). Only two paint overspray incidents causing damage have been proved in the four and one-quarter years that Nissan has occupied this property. The last incident occurred almost one year ago. Moreover, the evidence discloses that Maryland Shipbuilding has taken appropriate steps to prevent the occurrence of any further paint incidents. It has halted spray painting activities at Pier 5 and at the building slip. On the record here, this Court concludes that plaintiffs will be adequately compensated by the damages to be awarded to them for the paint incidents. There has been no showing that the negligent acts of defendant will continue in the future with such regularity that the Court should enter an injunction prohibiting all future spray painting by Maryland Shipbuilding at its shipyard. Accordingly, plaintiffs' request for injunctive relief will be denied.[21]

## IX

### Conclusion

For the reasons stated, the Temporary Restraining Order entered herein on Sep-

tember 18, 1981 is hereby dissolved. Plaintiffs' renewed motion for a preliminary injunction is denied. Judgment will be entered in favor of the plaintiffs on their claims arising as a result of paint damage occurring in May and August of 1981, the amount of damages to be determined at a later proceeding. However, plaintiffs are not entitled to a permanent injunction in connection with their claims of paint damage. Judgment will be entered in favor of the defendant on all of plaintiffs' other claims. Each side shall bear its own costs. Counsel should meet and present to the Court an appropriate Order.

---

**21.** Insofar as the smoke damage claims are concerned, the result would have been the same had it been necessary for the Court to

reach the issue, particularly since the equities in this case, as discussed elsewhere in this Opinion, tip decidedly in favor of the defendant.